THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MICHAEL HUDSON, Defendant-Appellant.

Fifth District   No. 81—386

Opinion filed March 21, 1983.

Randy E. Blue and Kent Bartholomew Mann, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Don W. Weber, State's Attorney, of Edwardsville (Stephen E. Norris and Karen L. Stallman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

Following a jury trial in the circuit court of Madison County, the defendant was convicted of home invasion and armed robbery. He was sentenced to 12 years' imprisonment on each count, the sentences to run concurrently. From this judgment, the defendant appeals, and argues (1) that the evidence introduced at trial was insufficient to prove that he entered the dwelling place of another without permission, and (2) that he was denied a fair trial when the prosecutor asked several

witnesses about an unrelated shooting incident involving the defendant.

The State's evidence consisted primarily of the testimony of Carl Levering. On October 1, 1980, he was alone at his Glen Carbon home when he heard someone at the door. Upon opening it, he saw the defendant, whom he recognized because the defendant had been at Levering's house with Levering's friend Kevin Sanders two days previously. The defendant asked Levering if he had seen Kevin Sanders recently, and then asked him if he could come inside to discuss purchasing marijuana. Levering invited the defendant into his house.

Once both men were inside, Levering told the defendant that, even though he had shared marijuana with Sanders, the defendant and others two days before, he did not sell marijuana. This conversation took place just inside Levering's front door, and lasted for about a minute. After that time, Levering recalled, Linroy Sanford entered the house and asked Levering if he could go into the kitchen. Levering acquiesced, and watched Sanford walking around in the kitchen, presumably to get a drink of water. Levering recognized Sanford because he too had been at his house with the defendant and Kevin Sanders.

About 10 seconds after Sanford entered his house, Levering saw a third man approach the front door. He had not seen this man before, but later identified him as John Hardy. Hardy stepped inside and suggested to the defendant that it was time for them to leave. Levering turned around to look at Hardy and discovered that Hardy was pointing a gun at him. He glanced back at the defendant and observed that he also held a gun. The men informed him that they intended to hold him up.

Hardy and the defendant frisked Levering and then ordered him into his bedroom and told him to lie down on the bed. While two of the men searched his house for valuables, the third man, whom he could not see, kept watch on him. At one point, Levering was informed that he would be killed if he did not cooperate, and someone hit him on the head with a pistol or rifle. After several minutes, the defendant led Levering back into the living room, where he was bound with a telephone cord and left with a stocking stuffed in his mouth. Levering eventually freed himself and called the police.

At trial, the defendant did not deny having been at Levering's home on October 1, 1980, with Sanford and Hardy, or two days previously with Kevin Sanders, Sanford and others. He contended, though, that on the first visit to the Levering residence he purchased marijuana from him, and, after smoking it later, he discovered that it was

"bad." On October 1, he went to Levering's house with Sanford and Hardy to get his money back. The defendant testified that he told Levering that he wanted a refund, although he would accept more marijuana, if it was of better quality than the earlier batch. When Levering brought him some marijuana from another room, he handed it to the defendant, who refused to pay him and then left. According to the defendant, Levering did not chase him or attempt to strike or shoot at him, but only replied that he would "get" the defendant. The defendant stated that he and Sanford were inside Levering's house, but John Hardy remained in the car. Hardy also testified to that effect.

In rebuttal, the State called Glen Carbon Police Chief Bill Moore and Robert Marlin of Police-Community Relations, Inc., both of whom were present at defendant's extradition hearing in Omaha, Nebraska. Moore and Marlin testified that, at that hearing, the defendant had stated under oath that he was not in Illinois on the date of the offense. The State also called Linroy Sanford as a rebuttal witness. He stated that on October 1, 1980, he and the defendant walked up to Levering's house while Hardy waited in the car. According to Sanford, the defendant and Levering were talking, and then arguing, about marijuana when the defendant pulled a pistol on Levering. Sanford claimed that he was surprised by this, and he fled from the house and waited outside with John Hardy for 10 or 15 minutes while the defendant and Levering could be seen moving from room to room. The defendant emerged from the house with a trash bag filled with marijuana and a shotgun. Sanford stated that, during the ride home, the defendant gave him Carl Levering's high school graduation ring. When Sanford was arrested in the early morning hours of October 2, that ring was found in his possession.

At his first assignment of error, the defendant does not challenge the jury's assessment of the credibility of the witnesses. Instead, he insists that the State's evidence was insufficient to prove him guilty of home invasion. He notes that the four occurrence witnesses agreed that Levering let him into the house, while the home-invasion statute explicitly requires that the entry of a dwelling place be "without authority." (Ill. Rev. Stat. 1981, ch. 38, par. 12—11(a).) We observe that no accountability instructions were given at trial and thus it cannot be claimed that if John Hardy's entry of Levering's house was made without permission, then the defendant is accountable for that entry.

■ The People respond that the defendant has waived the issue of the alleged failure of proof of his guilt beyond a reasonable doubt because the defendant did not file a post-trial motion. (*People v. Thiel*

(1981), 102 Ill. App. 3d 28, 429 N.E.2d 565.) But even upon consideration of this argument, we find the State's evidence sufficient to sustain the defendant's conviction of home invasion.

In *People v. Fisher* (1980), 83 Ill. App. 3d 619, 404 N.E.2d 859, defendant Fisher phoned Harris, an acquaintance of his, offered to give Harris a ride to a party that evening and told him that he would stop by Harris' apartment with some friends later that evening. About an hour later, Fisher arrived at the apartment with codefendant Hawkins, whom he introduced to Harris as "Sonny" and another person, who was introduced as "Mack." Harris invited the three inside to join him and his roommate, Dawkins, for some wine in the living room. At one point, Hawkins used the washroom at the apartment, and, another time, Dawkins observed Fisher return to the living room from the apartment's dining room. Harris and Dawkins testified that after the guests had been at the apartment for 15 or 20 minutes, "Mack" and Hawkins pulled guns on them. Fisher bound and gagged them and items were taken from their persons and their apartment. At trial, Fisher and Hawkins claimed that Fisher had called Harris to purchase marijuana from him, and that, after they arrived at the apartment, "Mack" sampled some of the marijuana, found it to be of inferior quality and then they left.

On this evidence, Fisher and Hawkins were convicted of burglary. One of their contentions on appeal was that the State's evidence did not show that they entered the apartment without authority. The court rejected this argument, stating that the authorization given by Harris and Dawkins to enter the apartment was limited to the purpose of a social visit, and, once that authority was exceeded when the three men pulled weapons on them, bound and gagged them and took their property, the consent for the entry was vitiated. It was recognized that this so-called "limited authority" doctrine had previously been applied in the reported decisions in Illinois only to the burglary of a building open to the public. However, the court found no reason to deny application of that rule to the burglary of a private residence.

Like the burglary statute (Ill. Rev. Stat. 1981, ch. 38, par. 19—1(a)), the home invasion statute specifically requires that the entry of a building be "without authority." Although, as the defendant argues, criminal statutes should be strictly construed in favor of the accused, it is also true that where the same words appear in different parts of the same statute, they will be given a consistent interpretation, absent legislative intent to the contrary. (*People v. Lutz* (1978), 73 Ill. 2d 204, 383 N.E.2d 171.) The defendant does not contend that the General Assembly intended the words "enters *** without authority" to

take on a different meaning for home invasion than they do in a burglary prosecution, and we find no indication that such an inconsistent interpretation was desired.

Since we conclude that "without authority" should mean the same under the burglary and home invasion statutes, the result reached in *Fisher* is persuasive authority in this case. As in *Fisher*, the men in the case at bar came to the private residence of a social acquaintance, and were allowed to enter the residence through the invitation of an occupant. In both cases, the men did not exceed the authority granted them, at least for a time, but later did so when they drew weapons upon their hosts, then bound and gagged them and stole their property. If the entry in *Fisher* was "without authority" under the burglary statute, then the defendant's entry of Carl Levering's home must be deemed "without authority" under the home invasion statute as well. The State's evidence was therefore sufficient to prove the defendant guilty of that offense beyond a reasonable doubt.

Finally, the defendant argues that two questions asked by the prosecution denied him a fair trial. In cross-examination of the defendant, the prosecutor asked whether the defendant and Linroy Sanford had been involved in a shooting incident the night of the offense. The defendant did not deny this, but stated that Sanford had shot at him. The prosecutor asked John Hardy if he had been "involved in any kind of dispute at all that night" with the defendant. Hardy denied any dispute. The defendant also referred to the incident in his cross-examination of Linroy Sanford, but Sanford also stated that the defendant had not shot at him.

■ The People correctly note that the defendant, acting *pro se*, did not object to the prosecution's questions concerning this incident, nor, as discussed above, did the defendant file a post-trial motion. Thus, these questions will not constitute grounds for reversal unless they rise to the level of plain error. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227; *People v. Hammond* (1977), 48 Ill. App. 3d 707, 362 N.E.2d 1361.) We cannot say that plain error has occurred. In none of the answers to the objectionable questions was it in any way intimated that the defendant had shot at Linroy Sanford, or had done anything which could be considered an unrelated crime. In fact, defendant's answer to the question put to him about the incident can only be seen as having benefited him, as it suggested that Sanford, who was called as a State's witness in rebuttal, was responsible for the shooting incident. We find nothing to have prejudiced the defendant in that examination and therefore will not consider it as plain error.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

HARRISON, P.J. and KARNS, J., concur.