THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARL SANDERS, Defendant-Appellant.

First District (1st Division)   No. 82—3089

Opinion filed December 17, 1984.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Karen C. Wirth, and Pamela Martin, Assistant State's Attorneys, of counsel, for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Following a jury trial, defendant Carl Sanders was found guilty of two counts of attempted murder, of armed robbery, home invasion, and murder (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 18—2, 12—11 and 9—1(a), respectively), and sentenced to concurrent prison terms of 30 years for attempted murder, armed robbery and home invasion, and 40 years for murder. On appeal, defendant contends that: (1) the State failed to prove that either he or one for whom he was accountable entered the victim's home without authority; (2) the State failed to prove that either he or one for whom he was accountable took the victims' missing automobile; (3) the jury was improperly instructed on the charge of attempted murder; (4) the trial court's refusal to allow him to converse with defense counsel during a lunch recess denied defendant effective assistance of counsel; and (5) in the event the convictions for home invasion and armed robbery are reversed, resentencing is necessary.

Defendant was charged under the theory of accountability for offenses committed against Barbara McGee, Jessie McGee and Joseph Kneeland during the early morning hours of March 12, 1981. At trial, Barbara McGee testified that, approximately 2:30 a.m. on the morning in question, she was awakened by the front door bell of her home at 8343 South Woods, Chicago. She answered the door and admitted her son-in-law, Gregory Macon, into the house. They talked for a few minutes, after which Mrs. McGee permitted Macon to spend the night. Prior to that evening, Macon's wife and the four Macon children had been living with the McGees for approximately four months,

during which time Macon would also sleep there on an "on and off" basis.

After returning to her bedroom, which she shared with her husband, Jessie, Mrs. McGee was again awakened by Macon. He told her that he was having headaches and needed some medication. Jessie McGee gave Macon a couple of aspirin and he left, but returned a short time later to ask for some more. A few minutes later, Mrs. McGee was again awakened when Macon pushed open the bedroom door, turned on the light, and entered the room accompanied by Anthony Strong, who was armed with a gun. Strong kept the gun pointed at the McGees while he and Macon demanded money. Through her bedroom doorway, Mrs. McGee could see defendant and Lorenzo Strong in the kitchen and another unidentified male on the back porch. Mrs. McGee had known defendant, Macon's nephew, for approximately 10 years.

Jessie McGee then walked into the dining room, took his wallet out of the buffet and gave it to Macon and Strong. When Mrs. McGee tried to get out of bed, Macon told her to sit down and proceeded to tie her hands and feet with a rope. Jessie McGee told Macon that there was more money downstairs in a pair of beige shoes. When none of the intruders could find the money downstairs, they sent Joseph Kneeland down to look for it. Meanwhile, Macon carried Mrs. McGee to the middle bedroom and raped her. When the rope came loose, he retied her, raped her again, and left. She could hear the others, including defendant, hollering about the money and walking back and forth. Macon eventually returned to the bedroom, threw a telephone cord around Mrs. McGee's neck and choked her until she lost consciousness. When she regained consciousness, she heard her husband calling her name from a distance, after which she heard someone enter the room, felt a thump on her head, and again lost consciousness. When she regained consciousness, Mrs. McGee called to her son, who came into the bedroom, cut her loose, and then ran next door to get help. She again lost consciousness and did not regain it until the police were there and she was being put into an ambulance. At the hospital, Mrs. McGee learned that in addition to the neck wounds, she had also received two gunshot wounds to the back of her head.

Mrs. McGee further testified that at the time of the incident she owned a yellow and brown 1976 Cadillac. When she went to bed on the evening of March 11, the car was parked in front of her house. After the incident, the car, a color television, tape recorder, jewelry and wedding rings were missing.

Next, Joseph Kneeland, Barbara McGee's son, testified that when he arrived home from school approximately 3:15 p.m. on March 11, 1981, Macon, Lorenzo Strong and defendant were talking to his father. He heard his father tell them that he wanted them to leave, which they did. Kneeland had known both Macon and defendant for about 12 years and knew that defendant was Macon's nephew. Kneeland further stated that early the next morning he was awakened by Anthony Strong, who was standing next to him with a gun pointed at him. Strong told Kneeland to put the blanket over his head and to walk out into the hallway. While standing in the hallway, he heard his mother ask Macon what was wrong, heard his father tell the intruders to check his shoes downstairs, and heard footsteps go down and back up the basement stairs, followed by defendant's voice saying that there were no beige shoes and no money downstairs. The intruders then told Kneeland to go downstairs and look for the shoes. When he took the blanket off his head, he saw Macon, Anthony Strong and defendant, who was standing next to the buffet in the dining room with something silver in his hand. When Kneeland returned from downstairs without having found any money, he saw Lorenzo Strong and defendant in the kitchen. He and his father were told to stand near the entrance to the basement. At that time, defendant was standing in the basement doorway with a gun pointed at Kneeland, holding a newspaper to obscure part of his face. However, Kneeland recognized his voice. Macon then joined Kneeland and his father and told them to go downstairs. Kneeland went first, followed by his father. Macon stood at the top of the stairs, holding a gun and carrying a pillow under his arm. Suddenly Kneeland heard a "pow" sound, turned around, and saw his father falling down the stairs. When he started to run, he was hit by a bullet in the shoulder and fell. Macon then walked over to where Kneeland was lying, shot him behind the right ear, and went back upstairs.

When Kneeland's father began gurgling his wife's name, Macon came back downstairs. Kneeland heard another "pow," after which his father was silent. Shortly thereafter, all the upstairs footsteps ceased and Kneeland went upstairs to look for his mother. When he went to the living room and looked outside for the car, he noticed that it was gone. As he was going back toward the basement, he heard his mother's voice coming from his bedroom, and found her in there, tied up and with cuts around her neck. After carrying his mother to the dining room, Kneeland went next door to call the police. When the police arrived, Kneeland told them that Macon, defendant and two other males had robbed them.

Thereafter, a stipulation was entered into that if Dr. Teslow of the office of the medical examiner were called to testify, he would state that Jessie McGee died of a gunshot wound to the head and to the brain.

Next, Officer David Dioguardi of the Chicago police department testified that when he arrived at the McGee home on the morning of March 12, 1981, the injured were being removed and the house was in a general ransacked condition. After visiting Kneeland in the hospital, Dioguardi proceeded to an address given to him by Kneeland, where he arrested Macon. He then drove to defendant's residence, where he placed defendant under arrest. While in defendant's bedroom, Dioguardi asked him if he had any weapons. Defendant hesitated, looked toward the end of his bed where he was sitting and said "No." Dioguardi then told defendant to stand up while he searched the bed. In doing so, he recovered a .32 revolver. After Macon and defendant were transported to headquarters, Dioguardi proceeded to a home on 105th Place in Chicago, where he arrested Anthony Strong, Lorenzo Strong and Marvin Hammond and recovered two .32-caliber revolvers with bullets. On cross-examination, Dioguardi stated that the McGees' missing automobile was found parked five or six doors west of Macon's house.

Next, Sergeant Vincent Lomoro of the Chicago police department testified that the bullets removed from Barbara McGee and Jessie McGee were .32-caliber bullets.

Officer Fred Harris, a latent fingerprints examiner for the Chicago police department, testified that when he compared a latent palm print recovered from the right rear window of the McGees' Cadillac on March 13, 1981, to a reproduction of defendant's left palm print he found 10 points of identification. A stipulation was then entered into that the latent palm print was made by defendant. On cross-examination, Harris stated that he could not discern when the print had been left on the car and that he did not examine any other objects for fingerprints. The State then rested its case.

Defendant testified that on the afternoon of March 11, 1981, he and Lorenzo Strong accompanied Macon to the McGee home in order to help Macon move some of his belongings from the McGee home back to his own home. When they arrived at the McGees' house, Macon asked Jessie McGee if he could use the McGees' car to move some of his things. When Jessie refused, Macon borrowed some money from him for a taxi. Approximately 4 p.m., Macon, Strong, two of the Macon children and defendant left the McGee house in a taxi. Macon and defendant went to defendant's house, and Lorenzo and the two

Macon children went to defendant's mother's house next door. Approximately two hours later, defendant and Lorenzo Strong went to Strong's house to meet Anthony Strong and Marvin Hammond. Macon was not there. After playing cards and rehearsing their band for several hours, Hammond, Anthony and Lorenzo Strong and defendant drove to defendant's house. The Strongs and Hammond again went to defendant's mother's house. Macon was waiting for defendant in his living room and asked him whether he was still going to help him move. Although defendant thought 2 a.m. was too late for moving, he, Macon, both Strongs and Hammond drove to the McGee house in Hammond's car. While in the car, defendant did not hear any discussion about robbing the McGees, but knew that Macon always carried a gun.

When they arrived at the McGee house, Macon told them to drop him off in front and then to drive around to the back. Macon then admitted defendant, Hammond and both Strongs into the rear entrance of the McGee house. Lorenzo Strong and defendant sat down on the bed in the rear bedroom and watched television while Anthony stood in the bedroom doorway. Defendant heard Mrs. McGee tell Macon that he had already taken too many aspirin. Macon signaled defendant to follow him, and when they reached Kneeland's room, Anthony opened his door, turned on the light, put his hand over Kneeland's eyes and held a gun to his head. Defendant's first reaction was to leave, but he did not want to use the back door because Kneeland might see him and recognize him. Instead, he "trotted" to the front door, but could not unfasten the chain. He then stood behind a partition in the dining room waiting for a chance to get out. While standing there, he heard Macon and Anthony tell Mrs. McGee that this was a stickup. When Jessie McGee walked out of his bedroom, Anthony hit him over the head and robbed him. Macon then asked Anthony if he should tie up Mrs. McGee. Anthony said "yes," and told Jessie and Kneeland to go to the basement and to sit at the top of the stairs. He then latched the basement door. When Anthony told Mrs. McGee to get up, she said that she could not walk. Defendant did not know why. At that point, he was nervous and scared and just wanted to get out. After defendant saw Macon put Mrs. McGee in a different room, he went out to the back porch where Strong was waiting and told Strong that he knew the McGees and did not want to be involved. Strong told him not to worry and sent him into the house to get Macon so that they could leave. Macon told defendant that he was going to stay and call the police to report a robbery and tell them that he had been hit over the head. As he was leaving, defendant heard Jessie McGee

telling Macon that he knew Macon had something to do with the incident.

Anthony and Lorenzo Strong, Hammond and defendant then drove to Anthony's house in Hammond's car and divided the money taken from the McGees. Defendant allegedly refused to take any. Defendant denied that he had had a gun and further stated that he had neither seen a gun nor heard any gunshots. Approximately one hour later, Macon arrived at Anthony's house. When the group went outside, defendant noticed that Macon had a different car, but he did not recognize it as the McGees' automobile. Macon later drove defendant home in the car and asked defendant to hold his gun for him. Defendant took the gun and, once inside, threw it under his bed. A few hours later, defendant's wife woke him up and told him that some men were there to talk to him. He was then arrested for murder. Defendant claimed that he had had no idea what was going to happen when he went to the McGee house with the others.

On cross-examination, defendant stated that he had known the McGee family for about 10 years and that he saw Macon frequently because his mother watched the Macon children on weekends. The first indication defendant had had that something was wrong at the McGee house was when Anthony turned on Kneeland's bedroom light, put his hand over Kneeland's eyes and pointed a gun at him.

During the robbery, defendant did not try to leave via the back door because he did not want the McGees to see him. The only time that he ever spoke while in the McGees' house was when he asked Anthony what was going on. Further, he did not hear any vulgarities or shouts regarding money while he was there. Prior to being shown the police report, defendant did not know that Mrs. McGee had been raped. Defendant admitted that he had made no attempt to leave the scene once he was outside the McGee house. Instead, he followed Anthony's instruction to go back inside to get Macon. After doing so, defendant drove to Anthony's house with the others. He did not ask to get out of the car or to be taken home. In addition, once at the Strong's house, he made no attempt to leave and did not call the police when he arrived later at his own house.

At trial, defendant identified a photograph of the McGees' Cadillac as the car that Macon had driven to the Strongs' house directly after the robbery. He had never seen the McGees driving that particular car, and, in fact thought that the McGees had a black and white Cadillac rather than a yellow and brown one. When he asked Macon about the car that night, Macon told him that it belonged to his girlfriend. On the way home, defendant sat in the front passenger

seat. He stated that he might have touched the back window when Macon and Anthony were arguing outside the Strongs' house about the television in the trunk.

On redirect, defendant stated that, after the incident, Anthony told him that he and Macon had planned the robbery and had wanted defendant and Lorenzo there because the McGees knew their faces and "wouldn't be worried or nothing, because they knew us." Defendant further testified that Macon told him that he had called the police and told them that some boys had broken in.

In rebuttal, Barbara McGee testified that one can exit from the front door of her house by simply turning the lock; no key is required.

Following closing arguments and the court's instructions to the jury, the trial court denied defendant's motion for a mistrial. Subsequently, the jury returned a verdict of guilty as to murder, armed robbery, home invasion, and the two counts of attempted murder, and a verdict of not guilty as to the rape and deviate sexual assault charges. Thereafter, defendant's motion for a new trial was denied and defendant was sentenced to concurrent terms of 30 years for attempted murder, armed robbery and home invasion, and 40 years for murder.

■ Defendant contends that the State failed to prove that he or one for whom he may have been accountable entered the McGees' home "without authority," an essential element of the offense of home invasion. (Ill. Rev. Stat. 1983, ch. 38, par. 12—11(a).) Defendant argues that Macon, the first alleged intruder to enter the McGee home, was invited into the McGee home by Mrs. McGee. Once Macon had entered, he possessed common authority to invite others to enter as a result of his "occasional resident" status. Defendant admits that Macon was invited to enter for the "limited purpose of spending the night and not for the purpose of robbing" the McGees, but denies that this fact altered his authorized entry.

In response, the State argues that defendant has waived this issue for review because he failed to raise it in his post-trial motion. As an alternative argument, the State contends that even if Macon's entry was originally authorized, it became unauthorized when he or those for whom he was accountable commenced robbing and assaulting the McGee family. We disagree with the State's waiver argument; failure to prove an essential element of an offense may be raised for the first time on appeal. (*People v. Flowers* (1977), 52 Ill. App. 3d 301, 303, 367 N.E.2d 453.) However, we concur that Macon's entry became unauthorized when he allowed others to enter for the purpose of robbing and assaulting the McGee family. *People v. Hudson* (1983), 113 Ill. App. 3d 1041, 448 N.E.2d 178, *appeal denied* (1983), 96 Ill. 2d 545.

In *Hudson*, defendant appealed his conviction for home invasion on the ground that the evidence introduced at trial was insufficient to prove that he had entered the dwelling place of another without permission. The evidence revealed that the victim had invited defendant into his house to discuss the purchase of marijuana. After talking for approximately one minute just inside the victim's door, a friend of defendant whom the victim recognized entered the house and asked if he could go into the kitchen. The victim gave him permission to do so. A few minutes later, a third man approached the front door, stepped inside, and suggested to defendant that they leave. At that point, the victim turned around and discovered that the man who had gone into the kitchen was standing behind him with a gun pointed at his back. He then glanced at defendant and noticed that he, too, was holding a gun. The men then informed the victim that they intended to rob him.

In reaching its decision, the *Hudson* court adopted the rationale of *People v. Fisher* (1980), 83 Ill. App. 3d 619, 404 N.E.2d 859, which applied the "limited authority" doctrine previously restricted to burglary of public buildings to the burglary of a private residence, and further concluded that the statutory phrase "without authority," found in both the burglary and home invasion statutes, should have the same meaning. Accordingly, the *Hudson* court found that the authorization given to defendant and his friends to enter was limited to the purpose of a social visit, and once that authority was exceeded by their assault upon the owner, the consent for the entry was vitiated.

■ In the case at bar, as in *Hudson*, Macon was given permission to enter the McGee home for the purpose of spending the night. He exceeded the authority granted when he admitted defendant and the other assailants for the purpose of robbing the McGees. Moreover, contrary to defendant's argument, Macon did not possess common authority to admit others into the McGee home. The concept of common authority as it relates to third-party consent to a warrantless search " 'rests *** on mutual use of the property by persons generally having joint access or control for most purposes.' " (*People v. Seidel* (1983), 115 Ill. App. 3d 471, 474, 449 N.E.2d 1384, *appeal denied* (1983), 96 Ill. 2d 548, quoting *United States v. Matlock* (1974), 415 U.S. 164, 171 n.7, 39 L. Ed. 2d 242, 250 n.7, 94 S. Ct. 988, 993 n.7.) The record clearly negates any claim of Macon's mutual use of the McGee home. Although Macon had spent the night at the McGee home on an "on and off" basis, the record indicates that he had to receive permission to do so from Mrs. McGee on the night in question. Moreover, there is no evidence that he had a key to the premises or that he would be automatically admitted for the night. Finally, we find

the cases cited by defendant distinguished from this case for the reasons stated parenthetically: *People v. Shaffer* (1982), 111 Ill. App. 3d 1054, 444 N.E.2d 1096, *appeal denied* (1983), 93 Ill. 2d 547 (third-party consent to warrantless searches); *People v. Scott* (1982), 108 Ill. App. 3d 607, 439 N.E.2d 130 (defendant's acquittal of burglary charge removed intent necessary to convict for home invasion); *People v. Peace* (1980), 88 Ill. App. 3d 1090, 411 N.E.2d 334 (predated *Hudson* and restricted "limited authority" doctrine to burglary of public buildings); and *People v. Pettus* (1980), 84 Ill. App. 3d 390, 405 N.E.2d 489, *appeal denied* (1980), 81 Ill. 2d 597 (essential element of home-invasion offense omitted from information). Accordingly, we conclude that the State's evidence was sufficient to prove the defendant guilty of the offense of home invasion beyond a reasonable doubt.

■ Defendant next contends that his armed robbery conviction should be reversed because the State failed to prove that either he or one for whom he was accountable took McGee's automobile. Defendant argues that because he never admitted that the auto driven by Macon immediately after the McGee robbery was the missing McGee vehicle and because none of the State's witnesses saw defendant or another for whom he was accountable take the McGee auto, he was not proved guilty of armed robbery beyond a reasonable doubt.

A conviction may be sustained on circumstantial as well as direct evidence. The only requirement is that the proof be of a conclusive nature and tend to lead, on the whole, to a reasonable and moral certainty that the accused and no one else committed the crime. (*People v. Anton* (1981), 100 Ill. App. 3d 344, 351, 426 N.E.2d 1070.) In the present case, an examination of the record as a whole reveals that there was substantial evidence to show beyond a reasonable doubt that one for whom defendant was accountable took the McGee automobile with force or threat of imminent force. Initially, Mrs. McGee testified that when she went to bed on the evening of March 11, 1981, her yellow and brown 1976 Cadillac was parked in front of the McGee home. Joseph Kneeland subsequently testified that shortly after the intruders left the McGee home, he looked out the front window and noticed that the Cadillac was missing. Later that day, the police located the missing auto parked five or six doors west of Macon's home and also recovered defendant's palm print from the rear side window of the McGee auto. Most importantly, contrary to defendant's contention that he never admitted that Macon was driving McGee's auto, at trial defendant identified a police photograph of the McGee automobile as depicting the auto that Macon had driven to Strong's house immediately following the McGee robbery. Accordingly, we conclude

that the evidence establishes defendant's guilt of armed robbery beyond a reasonable doubt.

 Defendant next argues that the trial court committed reversible error in giving a jury instruction which misstated the burden of proof as to the offense of attempted murder. The trial court orally stated the following issues instruction to the jury regarding the offense of attempted murder:

> "To sustain the charge of Attempt, the State must prove the following propositions:
>
> First: That the defendant, or one for whose conduct he is legally responsible, performed an act which constituted a substantial step towards the commission of the offense of Murder; and
>
> Second: That the defendant, or one for whose conduct he is legally responsible, did so with intent to commit the offense of Murder.
>
> If you find from your consideration of all the evidence that *any one* of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.
>
> If you find from your consideration of all the evidence that *any one* of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Emphasis added.)

Defendant argues that this oral instruction authorized the jury to convict defendant of attempted murder if less than all of the elements were found proved. Defendant further contends that the prejudicial error was augmented by an alteration in the written instructions of record which changed the word "any" in the last paragraph of the instructions to "each," resulting in the following:

> "If you find from your consideration of all the evidence that *each* one of the propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Emphasis added.)

Thus, defendant argues, the jury was instructed erroneously that he could be convicted of attempted murder if either one of the two elements were proved, and found not guilty only if each element was not proved. As a result, defendant contends that he was severely prejudiced by the fact that the jury was denied the appropriate application of the law to the facts.

The State argues that defendant waived any error the trial court may have committed by its failure to object to the jury instructions at trial or to allege the error in his post-trial motion. Although the fail-

ure to object to a jury instruction generally constitutes a waiver (*People v. Roberts* (1979), 75 Ill. 2d 1, 16, 387 N.E.2d 331), where there are such grave errors in instructions as to affect the requirements of a fair and impartial trial, the plain error doctrine set forth in Supreme Court Rule 451(c) (87 Ill. 2d R. 451(c)) provides for a relaxation of the rule that a party may not assert error if he has caused or permitted an erroneous instruction to go to the jury. (*People v. Ogunsola* (1981), 87 Ill. 2d 216, 222-23, 429 N.E.2d 861; *People v. Jenkins* (1977), 69 Ill. 2d 61, 66, 370 N.E.2d 532; *People v. Martinez* (1979), 76 Ill. App. 3d 280, 283, 395 N.E.2d 86.) Thus, under the plain error doctrine, we consider the alleged error.

It is well-established that in criminal cases, the court bears the burden of seeing that the jury is properly instructed on the elements of the crime charged, on the presumption of innocence and on the question of burden of proof. (*People v. Parks* (1976), 65 Ill. 2d 132, 137, 357 N.E.2d 487.) The court's failure to give properly any of these three essential jury instructions serves to deprive the accused of a fair and impartial trial. *People v. Williams* (1983), 120 Ill. App. 3d 900, 904, 458 N.E.2d 1312.

■ In the present case, the error in instructions occurred in an essential mandatory instruction which explained the burden of proof. It was not a mere technical defect or an error in a nonmandatory instruction which frequently may be remedied by reading the entire series of instructions as a whole. (*People v. Huckstead* (1982), 91 Ill. 2d 536, 546, 440 N.E.2d 1248; *People v. Roberts* (1979), 75 Ill. 2d 1, 14, 387 N.E.2d 331.) Further, not only were the oral and written instructions individually erroneous, together they presented conflicting and contradictory grounds by which the jury was to reach a not-guilty verdict.

In reviewing the numerous cases cited by the parties on this issue, we find *People v. Jenkins* (1977), 69 Ill. 2d 61, 370 N.E.2d 532, and *People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861, dispositive of the issue in favor of defendant's contention. In addition, we find *People v. Underwood* (1978), 72 Ill. 2d 124, 378 N.E.2d 513 (omission of a nonmandatory instruction); *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331 (inclusion of incorrect mental states in a nonmandatory definitional instruction does not constitute grave error); and *People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248 (instructions were neither contradictory nor missing essential elements of the crime charged), relied upon by the State, factually distinguishable for the parenthetical reasons stated.

In *People v. Jenkins* (1977), 69 Ill. 2d 61, 370 N.E.2d 532, the su-

preme court reversed a conviction for attempted murder because two contradictory instructions regarding the claim of self-defense were given. The court held that, although one instruction had been proper, by combining it with an incorrect instruction, the trial court confused the jury. The court reasoned that:

"Where the instructions are contradictory the jury is put in the position of having to select the proper instruction—a function exclusively that of the court. As far as can be known, defendant might well have been convicted on the basis of the erroneous instructions. Certainly, a person should not stand to lose his liberty because a jury has received equivocal instructions." 69 Ill. 2d 61, 67.

In *People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861, the State's burden instruction failed to contain a necessary element of the offense of deceptive practices, *i.e.*, intent to defraud. In reversing defendant's conviction and remanding for a new trial, the supreme court stated that "[j]ury instructions that incorrectly define the offense cause prejudice to a criminal defendant far more serious than instructions that do not include a definition of a term." 87 Ill. 2d 216, 223.

As previously stated, in the present case, not only were the attempted murder instructions contradictory, they incorrectly set forth the burden of proof. As they were received by the jury, defendant could have been found guilty if he had taken a substantial step, but did not have the intent to commit murder. Because an attempted murder instruction must make clear that intent to kill is necessary to convict for attempted murder (*People v. Harris* (1978), 72 Ill. 2d 16, 27, 377 N.E.2d 28), the possibility that the jury might have reached its determination of guilt based solely on the substantial step element alone mandates reversal and remand for a new trial on the two charges of attempted murder, even though the evidence was sufficient to find defendant guilty of those charges beyond a reasonable doubt.

■ Defendant argues that the murder, home invasion and armed robbery charges should be reversed and remanded for a new trial because his right to effective counsel was violated by the trial court's order which prohibited him from speaking with his attorney during a lunch recess which was called between his cross-examination and redirect examination. We disagree.

Upon completion of his cross-examination, the following colloquy ensued:

"COURT: It is a quarter after. Lunch has been here about fifteen minutes. I don't want it to get cold.

DEFENDANT: I have only three questions.

COURT: I will excuse the jurors for lunch until 1:15.

I want nobody to talk to the witness because he is on the stand.

[outside presence of jury]

DEFENDANT: Judge, there is a case, Judge Epton overnight forbade an attorney to talk to his client.

The case was reversed.

COURT: While his client was on the witness stand?

DEFENDANT: While his client was on the witness stand.

COURT: What level was it, Appellate Court?

DEFENDANT: Sure, it was Appellate Court.

STATE: What happened?

COURT: Once a witness takes the stand,—

DEFENDANT: I give you my oath, I want to talk to him, but not about his testimony.

COURT: When a witness is on the stand, it is within the discretion of the Judge to sequester him, and not even his own attorney, not even the State, is allowed to talk to him.

DEFENDANT: I respectfully take exception.

COURT: The order stands.''

Defendant relies on *Geders v. United States* (1976), 425 U.S. 80, 47 L. Ed. 2d 592, 96 S. Ct. 1330, and *People v. Noble* (1969), 42 Ill. 2d 425, 248 N.E.2d 96, in support of his contention. In each of those cases, defendant was prevented, over defense counsel objection, from consulting with his attorney during overnight 17-hour recesses. Those courts held that defendants' sixth amendment rights had been violated. Here, a lunch-hour recess only was involved; defendant's attorney did not want to talk to him about his testimony; and immediately after defendant left the witness stand his attorney spoke with him. We find that his sixth amendment rights were not violated. (See *People v. Moore* (1984), 128 Ill. App. 3d 505; *People v. Stroner* (1982), 104 Ill. App. 3d 1, 432 N.E.2d 348; *People v. Seider* (1981), 98 Ill. App. 3d 175, 423 N.E.2d 1217, *appeal denied* (1981), 85 Ill. 2d 573.) Defendant was not denied effective assistance of counsel.

Because we affirm the convictions and sentences for home invasion and armed robbery and reverse and remand for a new trial the convictions and sentences for attempted murder, we find that no reason exists for remanding the murder conviction for resentencing. The evidence was sufficient to prove defendant guilty of murder beyond a reasonable doubt.

For the foregoing reasons, the judgment and sentences on the

two counts of attempted murder are reversed and the cause is remanded for further proceedings consistent with this opinion. In all other respects, the convictions and sentences are affirmed.

Affirmed in part; reversed and remanded in part.

BUCKLEY, P.J., and McGLOON, J., concur.