THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH RACANELLI et al., Defendants-Appellants.

First District (5th Division)   Nos. 83—972, 83—977 cons.

Opinion filed March 15, 1985.

PINCHAM, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Judith A. Stewart, Assistant Public Defender, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Linas J. Kelecius, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE MEJDA delivered the opinion of the court:

Defendants, Joseph Racanelli and Johnny Watters, were charged with home invasion (Ill. Rev. Stat. 1979, ch. 38, par. 12—11(a)(2)), burglary (Ill. Rev. Stat. 1979, ch. 38, par. 19—1), and murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1). Following a jury trial, verdicts were returned finding each defendant guilty of home invasion and burglary and not guilty of murder as to each defendant. Each defendant was sentenced to concurrent terms of five years for burglary and 12 years for home invasion. Each defendant asserts on appeal that the trial court erred in denying his motion to suppress his oral and written confessions, and that he was not proved guilty beyond a reasonable doubt in the absence of the confessions. We affirm.

On the evening of August 20, 1981, 12-year-old Jimmy Lopez, an eyewitness, went to the apartment of the victim, Robert Reynolds.

Lopez watched television with the victim for awhile. Later, Racanelli, Lopez' cousin by marriage, stopped by the apartment. Lopez testified that around 10 p.m. he went to sleep in the victim's bedroom. Sometime later he woke up and saw the victim and Watters in the bedroom. The victim was staggering about the room with a stab wound in his back. Lopez then saw Watters stab the victim in the chest with a butcher knife. Lopez began screaming at Watters to stop. At this point, Racanelli looked into the bedroom and called, "Let's go," to Watters. Lopez stated that Racanelli had a knife in his hand. Defendants then exited through the front door of the apartment.

After the defendants left, Lopez testified that he dressed, padlocked the bedroom door as Racanelli had requested, and left the apartment. On his way out of the apartment, he noticed that two television sets, a stereo, headphones, a radio, speakers and a clock were missing. Lopez stated that he then walked through a vacant apartment next door to that of the victim to get to the back door of the building. Lopez recognized some articles in this apartment, including the headphones and a lamp which had been in the victim's bedroom before he went to sleep. He opened a cupboard in the vacant apartment and saw the knife Watters used to stab the victim lying on the shelf. After leaving the building through the back door, Lopez went to his father's house.

Lopez testified that Racanelli telephoned him a few days later telling him to "keep his mouth quiet" and that "it wasn't supposed to happen like that." Until the police arrested Lopez on September 2, he did not talk with the police about the incident. After the police informed him that he was a prime suspect in the murder and that they intended to try him as an adult, he told them about Racanelli and Watters. Lopez then gave a written statement to Assistant State's Attorney Francis Mahon, Jr.

An assistant public defender, William Kunz, testified that on January 11, 1982, he was present during a conversation with Jimmy Lopez at the public defender's office. He testified that Lopez told him he did not see the stabbing but rather found the victim lying dead next to him on the bed, that he had sex with the victim for money that evening, that the police had beaten him, and that he had made a statement that the police had instructed him to make. On cross-examination, Kunz stated there was no record of the conversation, although he could have summoned a court reporter if he had chosen to do so. Lopez testified that he did not recall talking with anyone from the public defender's office. He further testified that he knew the victim was a homosexual but that he had never had sexual relations with

him. Lopez stated that he never told the public defender's office that he did not see the stabbing.

Lopez' testimony regarding the items found in the adjacent apartment was corroborated by Zonhair Dajani, the manager of the victim's apartment building. Dajani testified that he found a lamp and headphones in the unlocked apartment on August 23. He also found a bloody knife on the shelf of a cabinet. Sharon Ellis, a microanalyst, testified that the victim's blood type matched that of the blood found on the knife and on the victim's bed.

## I

Defendant Racanelli argues that the trial court erred in denying the motion to suppress his oral and written statements because the police and prosecution failed to inform him of charges pending against him. At the hearing on his motion to suppress, Racanelli testified that on September 12, 1981, while in Tennessee, he phoned Detective Sappanos because one Johnny Lopez said the police wanted him to be a witness. Sappanos then told him he wanted to use him as a witness but did not tell him there was a warrant for him. Racanelli agreed to come to Chicago and be a witness. On September 18, 1981, he called Sappanos and his partner, who came to Johnny Lopez' house to meet them. They did not tell him about the warrant, did not handcuff him, nor tell him he was under arrest. On cross-examination, Racanelli testified that he could not remember whether the State's Attorney had told him that he was just a witness. He stated that he admitted burglarizing an apartment only after he had been told that he could go home after he made a statement. Racanelli remembered being told that he could see a lawyer but was not sure when that occurred.

Detectives Thomas Keane and Thomas Sappanos testified that Racanelli called them at the police station on September 18 and that they arranged to meet him at Lopez' apartment for the purpose of Racanelli's surrender. Sappanos testified that he had informed Racanelli of the warrant during the telephone conversation on September 18 and in an earlier conversation with him on September 12. During the earlier conversation, Racanelli asked Sappanos what his, Racanelli's, alternatives were. After being told that an arrest warrant had been issued for his arrest and that he had the option to continue to flee or to surrender, Racanelli stated he would prefer to surrender in Chicago. Sappanos testified that although his police report did not reflect that he had told Racanelli there was a warrant for his arrest, his report did state that Racanelli was planning to surrender himself in the near future. Keane testified that Racanelli was told he was un-

der arrest when they left Lopez' apartment and went with the police willingly. He was not handcuffed, fingerprinted or placed in a cell at the police station. Keane stated that he also told Racanelli there was a warrant for his arrest regarding the apartment burglary and murder. Both detectives testified that Racanelli was given *Miranda* warnings several times, which he indicated he understood, and that he never requested a lawyer.

After arriving at the police station, the detectives called Assistant State's Attorney Robert Kaiser. After Kaiser arrived, he spoke with Racanelli. Detective Keane was also present. Kaiser stated that Racanelli indicated he still wanted to talk to him after Kaiser had explained his office to Racanelli and had given him *Miranda* warnings. Racanelli indicated that he understood the warnings. After talking with him for about 15 minutes, Racanelli communicated his willingness to make a statement. Kaiser again gave the *Miranda* warnings. Racanelli stated he understood them and signed a waiver of rights form. Racanelli then made a statement in the presence of a court reporter, Sappanos, Keane and Kaiser admitting his involvement in the apartment burglary. Kaiser stated that he did not tell Racanelli he was only a witness and denied telling him that he would not need a lawyer. After hearing all the testimony, the trial court denied Racanelli's motion to suppress the statements made to the police.

It is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given their testimony and the inferences to be drawn from that evidence. (*People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733.) Where the evidence is merely conflicting, a court of review will not substitute its judgment for that of the trier of fact. (63 Ill. 2d 296, 298-99, 347 N.E.2d 733.) In the instant case, Racanelli's contention with regard to the motion to suppress is essentially a question of credibility. The trial court specifically stated at the conclusion of the hearing that he believed the testimony of the prosecution witnesses. Viewing the case in that posture, the evidence indicates that Racanelli made a knowing and intelligent waiver of his rights before making his statement. If a defendant chooses to speak and does not request a lawyer after being informed of and understanding his *Miranda* rights, a court may properly find that he understood those rights and chose not to exercise them. (*People v. Winston* (1982), 106 Ill. App. 3d 673, 682, 435 N.E.2d 1327.) In this case, the decision of the trial court was well within the limitation on review that a trial court's findings on a motion to suppress should not be disturbed unless contrary to the manifest weight of the evidence. (106 Ill. App. 3d 673, 683, 435 N.E.2d 1327.) Accordingly, this contention

is without merit. We find that the trial court did not err in denying defendant Racanelli's motion to suppress his oral and written statements.

■ Racanelli additionally urges that the authorities' failure on September 12, 1981, to inform him of the charges pending against him violated his sixth amendment right to counsel. He maintains that formal adversary proceedings were initiated against him on September 3, when the murder complaint was signed against him and a murder warrant was issued for his arrest. He argues, therefore, that he was entitled to know of the pending charges and to have counsel present during his telephone conversations with the police on September 12 and 18. The State responds that Racanelli's sixth amendment right to counsel did not attach on September 3, when an arrest warrant was issued on a complaint signed by a police officer, but instead it attached on November 2 when Racanelli was indicted.

An individual's sixth amendment right to counsel attaches at or after the initiation of adversary judicial criminal proceedings whether by way of formal charge, preliminary hearing, indictment, information or arraignment. (*Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881-82.) The initiation of adversary proceedings is determined by looking to the point at which the government has committed itself to prosecute and the adverse positions of the parties have solidified. 406 U.S. 682, 689, 32 L. Ed. 2d 411, 418, 92 S. Ct. 1877, 1882.

■ Illinois law provides that felony prosecutions must be commenced by indictment or information and not by complaint. (Ill. Rev. Stat. 1979, ch. 38, pars. 111—1, 111—2.) Further, only the State's Attorney has the authority to file a felony charge, and a police officer is without that authority to prosecute such a charge. (*People v. Pankey* (1983), 94 Ill. 2d 12, 19, 445 N.E.2d 284.) Thus, the State cannot be said to have filed a formal charge committing itself to the prosecution of Racanelli simply with the filing of a complaint by a police officer.

Illinois courts have expressly held that the issuance of an arrest warrant does not formally charge a defendant with a crime. (*People v. Mitchell* (1983), 116 Ill. App. 3d 44, 47, 451 N.E.2d 934; *People v. Dockery* (1966), 72 Ill. App. 2d 345, 355, 219 N.E.2d 687.) An exception to this rule has been found when the filing of a complaint by a police officer is made at the direction of the State's Attorney. (*People v. Owens* (1984), 102 Ill. 2d 88, 101, 464 N.E.2d 261.) In the case at bar, the complaint for warrant was not filed at the request of the State's Attorney and the rule of *Owens* is not applicable. We therefore find that Racanelli's right to counsel did not apply to the telephone

conversations and that his sixth amendment right to counsel was not violated.

## II

■ Defendant Watters contends that the trial court erred in denying the motion to suppress his oral and written statements in light of his low intelligence. Watters, 16 years old at the time of the homicide, testified at the suppression hearing that he was arrested at 5 a.m. when he was awakened by a police officer holding a gun to his head. At the police station, Watters was handcuffed and placed in a small room for about an hour. Two police officers gave him *Miranda* warnings. Watters testified that he asked to see a lawyer. The police told him that he could see a lawyer when he went to the Audy Home, a juvenile detention center. Watters testified that he did not understand that any statements he might make could be used against him. He also did not understand the warning that he could be tried as an adult. Watters stated that he did understand that he could have a lawyer if he wanted to talk. Watters testified that sometime later a man came into the room, read him *Miranda* rights, and asked him to sign a statement. The man read the statement and told Watters to read it. Watters initialed the bottom of each page of his statement and printed his name at the end.

Detective Sappanos testified that he and Detective Keane conducted the initial interview with Watters at the police station advising him of his rights. Watters indicated that he understood his rights. Sappanos testified that Watters seemed reasonably intelligent and denied telling Watters that he would have a lawyer at the Audy Home.

During a second interview with Watters, Assistant State's Attorney Mahon testified that he told Watters he was not his attorney but that he worked with the police. He advised Watters of his *Miranda* rights. Watters stated that he understood his rights and that he was willing to talk. Because he was 16 years old, Mahon told Watters he could be tried as an adult. Watters stated that he understood. Prior to taking Watters' written statement, to which Watters agreed, Mahon explained what questions would be asked of him when the court reporter arrived.

A third conversation ensued in the presence of Mahon, a youth officer named Muscolino, and a court reporter. Watters was again read his rights. He admitted his involvement in the burglary, but stated that Racanelli had stabbed the victim. In addition to signing the written statement, Watters signed a written waiver of rights form. Mahon testified that Watters did not ask to see a lawyer nor did he request

that questioning cease. When asked if he could read, Watters responded affirmatively.

Paula Bailey, a Cook County Juvenile Court psychologist, testified that she administered a standard battery of psychological tests to Watters. She testified that he did not exhibit any psychoses but that his results were at a preschool level. She further testified that he had an I.Q. of 54, which is in the moderately retarded range. In her opinion, Watters probably could not understand *Miranda* warnings unless they were explained in simpler language. On cross-examination, Bailey stated that because these tests were not designed specifically to determine if Watters understood the *Miranda* rights, she had no personal knowledge as to whether he in fact understood them. She also testified that Watters would not understand the warning that he could be tried as an adult, but probably understood the words "court," "judge," "lawyer," "silent," "free," and "no charge." The witness testified that Watters had six prior station adjustments, three prior referrals to juvenile court, and was probably "street-wise." At the conclusion of the hearing, the trial court found that Watters waived his *Miranda* rights and denied his motion to suppress his statements made while in police custody.

The determination of whether an accused has waived his *Miranda* rights depends on whether the defendant in fact knowingly and voluntarily waived those rights. The inquiry as to whether defendant knowingly and voluntarily waived those rights focuses on the totality of the circumstances surrounding the interrogation. (*Fare v. Michael C.* (1979), 442 U.S. 707, 724-25, 61 L. Ed. 2d 197, 212, 99 S. Ct. 2560, 2571-72, *reh'g denied* (1979), 444 U.S. 887, 62 L. Ed. 2d 121, 100 S. Ct. 186, quoting *North Carolina v. Butler* (1979), 441 U.S. 369, 373, 60 L. Ed. 2d 286, 292, 99 S. Ct. 1755, 1757.) When regarding the totality of the circumstances, both the characteristics of the accused and the details of the interrogation must be considered. *People v. Stone* (1978), 61 Ill. App. 3d 654, 659, 378 N.E.2d 263.

The characteristics of the accused which must be examined are those which bear upon his ability to make knowledgeable and independent decisions. Pertinent factors are the defendant's age, intelligence, prior experience with the criminal law and emotional stability. (*People v. Stone* (1978), 61 Ill. App. 3d 654, 659, 378 N.E.2d 263.) Although subnormal mental capacity alone does not render a confession involuntary, it is a factor to be considered in determining the voluntariness and the admissibility of a confession. (*People v. Murphy* (1978), 72 Ill. 2d 421, 437, 381 N.E.2d 677; *People v. Hester* (1968), 39 Ill. 2d 489, 500, 237 N.E.2d 466.) Juvenile confessions are to be care-

fully reviewed to ensure that they are voluntary and not coerced, suggested, or the product of a juvenile's ignorance of rights, his adolescent fantasy, fright or despair. (*People v. Avery* (1980), 88 Ill. App. 3d 771, 775, 410 N.E.2d 1093.) While the prosecution bears a heavy burden of establishing that a statement was made knowingly, intelligently and voluntarily, where a trial court so finds after application of the proper legal standard, review is limited to whether that finding is contrary to the manifest weight of the evidence. *People v. Kincaid* (1981), 87 Ill. 2d 107, 116-18, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726.

In the instant case, the trial court found that the confession was voluntary and stated that:

"I have testimony before me from a woman who claims that from her testing, at times some part of the test, he demonstrated the ability of a five-year-old or a seven-year-old. I have to take that into consideration. That is part of the totality, but I think his responses and the questions and the degree of difficulty that he might have with the questions that might appear difficult to a person of low intelligence, I think I have to consider all of that."

This statement demonstrates that the trial court did in fact apply the proper standard in evaluating the admissibility of the statements. This finding was supported by evidence that Watters could understand various words, that he appeared to understand the warnings, that he in fact told the police that he understood the warnings, that he testified that he knew he could talk with a lawyer, and that he had had some prior experience with the criminal court system. Although Bailey testified on Watters' behalf, the trial court specifically stated that her testimony was not persuasive. The trial court need not accept an expert's conclusions of fact. (*People v. Grice* (1984), 121 Ill. App. 3d 567, 568, 459 N.E.2d 1122.) Accordingly, the trial court's decision was not against the manifest weight of the evidence.

Watters cites *People v. Redmon* (1984), 127 Ill. App. 3d 342, 468 N.E.2d 1310, in support of his position. In *Redmon*, the defendant expressly stated during an interview with the police that he did not understand his right to talk to and be represented by a lawyer while being questioned. After this was explained, he asked that questioning cease. Defendant never signed a written waiver of rights form. In contrast in the instant case, Watters indicated at all times during questioning that he understood his rights. According to his own testimony at trial, he understood at the time he was questioned that he could have an attorney if he was willing to talk with the police. Testi-

mony at trial revealed that Watters had several prior experiences with the law while the *Redmon* defendant had not. We find *Redmon* inapposite.

### III

■■ Both defendants advance the argument that they were not proved guilty beyond a reasonable doubt in the absence of their confessions. We disagree. Furthermore, as discussed earlier, the trial court did not err in denying either defendant's motion to suppress his statements admitting participation in the homicide. A reviewing court will not reverse a criminal conviction unless the evidence is so improbable as to raise a a reasonable doubt of a defendant's guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) In a jury trial, it is the function of the jury to determine the credibility of the witnesses and the weight to be given their testimony. (*People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733.) A court of review will not substitute its judgment for that of the trier of fact where the evidence is merely conflicting. 63 Ill. 2d 296, 298-99, 347 N.E.2d 733.

■■ The material elements of the offense of burglary are entry into a building without authority, or remaining after authority to enter has been withdrawn, with the intent to commit a felony or theft. (*People v. Sansone* (1981), 94 Ill. App. 3d 271, 273, 418 N.E.2d 862.) Defendants' entry into the victim's apartment, although initially with the victim's authority, exceeded that authority when they attacked the victim and removed his property. (See *People v. Hudson* (1983), 113 Ill. App. 3d 1041, 1044-45, 448 N.E.2d 178.) Defendants' confessions, coupled with inferences drawn from Lopez' testimony, establish the specific intent to commit a burglary. Lopez testified that certain items which were in the apartment when he arrived were missing when he left. He recognized several of these articles in the vacant next-door apartment as he exited the building. We find there was sufficient evidence to establish beyond a reasonable doubt that defendants were guilty of burglary.

■■ Home invasion is the entry without authority of the dwelling place of another by a person not a peace officer acting in the line of duty, knowing that one or more persons is present and intentionally causing injury to any person within such dwelling place. (Ill. Rev. Stat. 1979, ch. 38. par. 12—11(a)(2).) The words "without authority" have the same meaning under the home invasion statute as they do under the burglary statute. (*People v. Hudson* (1983), 113 Ill. App. 3d 1041, 1045, 448 N.E.2d 178.) Therefore, defendants' presence in the

apartment was without authority once they attacked the victim and removed his belongings from the apartment. Both defendants knew that the victim was present at the time. Lopez testified that he saw Watters stab the victim before Watters and Racanelli fled. We find that the evidence was sufficient to establish that defendants were proved guilty beyond a reasonable doubt of home invasion.

For the reasons stated, the judgment finding defendants guilty of burglary and home invasion are affirmed.

Affirmed.

SULLIVAN, J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. These defendants should have been granted a severance. Their conflicting defenses during their joint trial violated each defendant's constitutional right to a fair and impartial trial. Moreover, the evidence was insufficient as a matter of law to establish their commission of burglary or home invasion. In addition, Joseph Racanelli's confession was extracted from him in violation of his Federal and State constitutional right to counsel. His confession therefore should have been suppressed.

I

Joseph Racanelli and Johnny Watters were charged in an indictment with the offenses of murder, armed robbery, burglary, theft, home invasion and armed violence. The offenses were alleged to have been committed in Cook County on August 21, 1981, and Robert Reynolds was the alleged victim.

On their arraignment on the indictment, the public defender of Cook County was appointed as attorney for Joseph Racanelli and private attorney Robin Harris was appointed to represent Johnny Watters. Each defendant entered a plea of not guilty.

The defendants separately confessed, but each defendant denied the fatal stabbing of the deceased and attributed it to the other. Defendant Watters filed a motion for a severance of his trial from the trial of his codefendant Racanelli on the grounds that Racanelli had made "oral and written statements implicating" Watters; that Racanelli's defense was "in conflict with, inconsistent with and antagonistic toward" Watters and that Watters could not obtain "a fair and impartial trial [with Racanelli] because of the prejudice created by the inconsistent, conflicting and antagonistic defenses." Racanelli's attor-

ney filed a similar severance motion and requested that Racanelli be tried separate from his codefendant Watters. Both defendants filed motions to suppress their respective confessions, and after evidentiary hearings their suppression motions were denied.

Four days later, on July 14, 1982, the defendants' severance motions were before the court, at which time Thomas Davy, the assistant State's Attorney, stated to the court, "I believe both counsels [for the defendants] have filed motions for severance based on statements, based on inconsistent defenses. The State, having reviewed the motions and the applicable law, I believe that a motion for severance would lie in this particular case so we would not be objecting to that." The court granted the severance motions.

Assistant State's Attorney Donald Devlin, however, on December 14, 1982, requested the trial judge to reconsider his allowance of the defendants' severance motions and asked the court to deny the motions. After considerable argument by the attorneys in support of and in opposition to the State's request that the court reconsider its severance ruling, the trial judge denied the motion for reconsideration and stated, "I'm going to let my order of severance stand." Thereupon, in apparent dissatisfaction with the court's ruling, Assistant State's Attorney Devlin requested "that both defendants be tried in front of two juries at the same time." Defense counsel objected, and after stating that he needed "time to think about it," the trial judge set a trial date for both defendants.

On February 28, 1983, Assistant State's Attorney Devlin again requested the trial judge to reconsider his allowance of the severance motions. The defendants again objected, but this time the trial judge granted the State's request and "allow[ed] the defendants to be joined" for trial. Thereupon, the State's motion to nol-pros the armed robbery, theft and armed violence counts was allowed. The jury selection began and was concluded on March 1, 1983.

A thorough search of the record on appeal fails to reveal what legitimate prosecutorial advantage was sought or obtained by the joint trial of these defendants. It is quite apparent, however, that the infelicitous advantage sought and obtained by the joint trial of the defendants was the presentation to the jury of the defendants' confessed involvement in the offenses and each defendant's attribution of the fatal stabbing of the deceased to the other.

During the trial, Jimmy Lopez, a State's witness, testified that at about 7 or 8 p.m. on August 20, 1981, he went to apartment 93 at 4240 North Clarendon, the apartment of the deceased, Robert Reynolds; that he had known Reynolds for about a year and a half and

knew that he was a homosexual. Lopez testified that Reynolds was present when he arrived, that he and Reynolds watched T.V. in the living room, and that later the defendant, Joseph Racanelli, came to the apartment. Lopez stated that after watching T.V., at about 10:30 p.m. he (Lopez) went into the bedroom and went to sleep. Lopez testified that when he awakened the following morning he saw Robert Reynolds and the defendant Johnny Watters in the bedroom and that Reynolds "was staggering around the floor with a stab wound in his back." Lopez testified that he (Lopez) "started yelling," that Watters stabbed Reynolds in the chest with a butcher knife and that Reynolds fell on the bed. Lopez stated that Racanelli, with a knife in his hand, then stuck his head in the door and said to Watters, "Let's go." Racanelli and Watters left out the front door. Lopez stated that he got dressed, locked the apartment door and also left. He stated that in leaving the building he went through apartment 90, an empty apartment on the same floor, and there on the floor he saw Reynold's property—a T.V., a stereo set, headphones, radio, speaker, radio alarm clock, and the knife with which Reynolds had been stabbed by Watters.

The testimony elicited on cross-examination of Lopez and the other prosecution witnesses by the defense attorneys are classic examples of shifting the responsibility for the offenses from one defendant to the other.[1] But each defendant, of course, in his defense had the right to endeavor to exculpate himself from involvement in the offenses and attribute the commission of the offenses to someone else, including a codefendant. The attorney for each defendant was obligated to staunchly and with vigorous tenacity present and pursue such defense. These rights of the defendants and this obligation of their attorneys were not and could not be curtailed, restricted or diminished by the expediency of a joint trial of the defendants.

Assistant State's Attorney Francis J. Mahon, a State witness, testified to the facts and circumstances surrounding Watters' written confession to him, after which he read Watters' confession to the jury.[2] Watters confessed that on August 21, 1981, at about 5:30 a.m., he was in Reynolds' apartment at 4240 North Clarendon with Joseph Racanelli to take Reynolds' property. Reynolds woke up and Racanelli stabbed him in the chest with a butcher knife. Lopez told Racanelli to stop. Watters and Racanelli put Reynolds' T.V., radio, earphones and

---

[1]Excerpts of the cross-examination of Jimmy Lopez are set forth in Appendix A and B.

[2]Excerpts of Johnny Watters' confession are set forth in Appendix C.

other property in an empty apartment next door and left. When Racanelli's attorney requested the trial judge to inform the jury that Watters' confession was admitted only as to Watters, the trial judge responded, "The jury will be instructed at the proper time."

Assistant State's Attorney Robert Kaiser, a State witness, testified to the facts and circumstances surrounding Racanelli's confession on September 18, 1981.[3] Kaiser was then requested to read Racanelli's confession to the jury. Watters' attorney asked the trial judge to admonish the jury that Racanelli's confession was not to be considered as evidence against Watters. The trial judge again responded, "They will be instructed at the proper time." Kaiser then read Racanelli's confession to the jury.

In his confession Racanelli stated that on the evening of August 21, 1981, at Reynolds' invitation, Racanelli went to Reynolds' house and started drinking with Reynolds, and that Racanelli and Reynolds drank about a quart of Bacardi. Reynolds got drunk and went to sleep, after which Racanelli and Watters moved Reynolds' household articles to an empty apartment. While Racanelli was in the empty apartment, he heard Lopez holler. Racanelli returned to Reynolds' apartment "to see what was happening," and that he saw Reynolds fall away from Watters, who had a knife in his hand. Watters stabbed Reynolds and Racanelli asked Watters, "Why did [he] do it?" Later that morning Racanelli gave Watters $30 for Watters' share of the purloined articles. Racanelli disposed of Reynolds' property by sale or gift.

The joint trial of Racanelli and Watters created an impermissible imbroglio that could have been and rightly should have been avoided, simply by a severance. The jury had before it three conflicting versions of the brutal and heinous homicide of Reynolds presented by the State, *i.e.*, the Lopez version, the Watters version, and the Racanelli version. These contradictory renditions were aggravated by the defense attorneys' cross-examination of the State's witness, pursuant to their duty to zealously represent their respective clients, even in an antagonistic defense posture. Their numerous mistrial motions were imperviously overruled.

Neither defendant testified. The only testimony presented on their defense was that of William Kunz, an assistant public defender, to prove up Lopez' impeachment, *i.e.*, that Lopez had said that he did not see the Reynolds' stabbing. The other defense witness, Paula Bailey, a clinical psychologist, testified that she tested Watters and con-

---

[3]Excerpts of Joseph Racanelli's confession are set forth in Appendix D.

cluded that he was intellectually subnormal.

The assistant State's Attorneys vociferously argued to the jury, with what they perceived to be convincing persuasion, that the evidence abundantly established the guilt of each defendant of murder and the other offenses beyond a reasonable doubt.[4]

The only admonition the trial judge gave the jury regarding one defendant's confession being inadmissible against the other was Illinois Pattern Jury Instruction (IPI), Criminal, No. 3.08 (2d ed. 1981), that "[a] statement made by one defendant may not be considered by you against any other defendant." This instruction was nothing but a futile and trivial collocation of words. The trial judge also instructed the jury on accountability (IPI Criminal 2d No. 5.03), that "[a] person is legally responsible for the conduct of another person when *** he knowingly *** aid[s] the other person in the planning or commission of the offense." The trial judge thereafter encompassed the accountability instruction in the issues instructions on the State's burden of proof to sustain the charges of murder, home invasion and burglary, IPI Criminal 2d Nos. 7.02, 11.22 and 14.06, as to the defendant Racanelli, and then repeated the same instructions as to the defendant Watters.

The jury retired to deliberate. The defendants' repeated and renewed motion for a mistrial, because of the prejudice occasioned by the defendants' joint trial, was again overruled.

During their deliberation, the jury sent out the accountability instruction along with a handwritten note which read:

> "Judge, for home invasion purpose, will you please clarify the definition of, (1) intentionally — if injury caused intentionally?, or if intent present on entering premises? (2) injury — personal or monetary?"

The trial judge responded with a note to the jury which read, "You have heard all the evidence and received all the instruction you are entitled to." During their deliberation the following day, the jury sent the trial judge two notes, along with two instructions. One of the instructions was on accountability, IPI Criminal 2d No. 5.03, previously set forth. The other instruction was IPI Criminal 2d No. 3.05, which had been given them and which read, "You should give separate consideration to each defendant. Each is entitled to have his case decided on the evidence and the law which is applicable to him. Any evidence which was limited to one defendant should not be considered by you as to the other defendant." One of the jury's notes inquired, "What

---

[4]Excerpts of the prosecutor's opening argument are set forth in Appendix E.

degree of murder is being tried? What latitudes are given in reference to a lesser charge?" The other jury's note stated, "One of their statements is contradictory of the other." The trial judge pondered whether the jury was referring to the defendants' statements (confessions), which the jury had in the jury room. The judge directed the jury to continue its deliberation.

The prosecutors' perception of the persuasiveness of the State's evidence was erroneous. The ignominious prosecutorial advantage of the defendants' joint trial failed to fully achieve the ultimate intended purpose. The jury returned verdicts finding both defendants not guilty of the murder. However, both defendants were found guilty of burglary and home invasion, on which findings the court sentenced each defendant to concurrent imprisonment terms of five and 12 years, respectively.

Defendant Joseph Racanelli asserted in his post-trial motion that, "The court erred for two reasons. First, the statements which were then allowed into evidence in the trial of each defendant were inconsistent and deprived each defendant of his right to confrontation. *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. Second, the defenses were so inconsistent that a single trial deprived each man of a fair trial. ***. More importantly, the two defendants were put into a position with antagonistic defenses, accusing each other of the crimes charged. On at least five occasions during trial and more-so during closing argument, defense counsel for Watters implied or tried to prove that Joseph Racanelli was framing Johnny Watters, and that Joseph Racanelli committed the murder, home invasion and burglary with Jimmy Lopez."[5]

The conflict between these defendants was not resolved by and did not terminate on the jury's burglary and home invasion guilty findings, or the imprisonment sentences imposed thereon. In fact, after the trial judge had admonished the defendants of their right to appeal, Racanelli's attorney, an assistant public defender, responded, "Mr. Racanelli intends to appeal. I have not prepared the notice of appeal at this time. Could I present it to your Honor later on today for signing for *appointment of the public defender?*" (Emphasis added.) Watters' court-appointed private attorney thereupon stated, "Judge, *Mr. Watters is also going to appeal, but somebody, I assume, other than the public defender would have to be appointed.*" (Emphasis added.) Nevertheless, before this court, on this appeal, both defend-

---

[5]Excerpts of the arguments of defense attorneys to the jury are set forth in Appendices F and G.

ants are represented by the same attorney, the public defender of Cook County, and in the defendants' joint brief the trial court's denial of their severance motions and the prejudice of their antagonistic defenses on their joint trial are not assigned by their appeal attorney as grounds for reversal.

It is provided in Illinois Supreme Court Rule 615 (87 Ill. 2d R. 615(a)) that on appeal, *"Plain errors or defects affecting substantial rights may be noticed* although they were *not* brought to the attention of the trial court."* (Emphasis added.) The trial court's denial of the defendants' severance motions and their antagonistic defenses *were* brought to the attention of the trial court in the instant case, but this would not cause Supreme Court Rule 615 to be inoperative before this court; rather, it enhances its application here. *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827; *People v. Benniefield* (1980), 88 Ill. App. 3d 150, 410 N.E.2d 455; *People v. Lagardo* (1967), 82 Ill. App. 2d 119, 226 N.E.2d 492.

## II

Thus, the threshold *sua sponte* question presented on this appeal is the ability of the defendants' attorney to firmly and loyally advocate the interest of each defendant before this court. I present this issue; however, I find it unnecessary to resolve it, because in my opinion the evidence is legally insufficient to sustain the guilty findings of burglary and home invasion.

In their confessions the defendants accused each other of committing the homicide. Each assigned antagonistic defenses in the trial court as grounds for their severance motions. Their separate attorneys, by cross-examination and by their arguments to the jury, endeavored to exonerate their respective clients by affixing guilt to the other defendant. Can a single attorney now before this court, with zeal, fidelity and integrity, simultaneously pursue the rights and interests of both defendants?

In *People v. Echols* (1978), 74 Ill. 2d 319, 385 N.E.2d 644, Johnny Wilson, Kenneth Echols and his brother, William Echols, were tried before a jury for a June 5, 1974, burglary of a Decatur tavern. All three defendants were represented by the public defender. During the trial, the evidence established the defendants' presence at the rear door of the burglarized tavern. The trial evidence further established the presence of three unidentified men at the drive-up window of the closed tavern. The defendants were arrested some distance from the tavern in an automobile, in the trunk of which property from the burglarized tavern was discovered. A fingerprint was found on a piece of

broken glass from the tavern's drive-up window. The fingerprint on the broken glass matched the fingerprint on a fingerprint card (State's exhibit No. 11) bearing the name Kenneth Echols. An officer testified that he assisted Kenneth Echols in placing his fingerprint on the fingerprint card. When asked to identify the person whom he assisted in placing his fingerprint on the exhibit, the officer did not identify the defendant Kenneth Echols, rather he mistakenly identified the defendant Johnny Wilson. Thereupon, out of the jury's presence, the State sought to obtain the fingerprints of Wilson and Echols. Their attorney successfully resisted the effort.

Testimony was admitted that the fingerprint on the fingerprint card was identical to the print found on the tavern's broken drive-up window glass. In closing argument, the defendants' attorney argued that the ambiguity of the fingerprint evidence diminished its probative value as to all the defendants. He did not argue that the print did not belong to Wilson. In fact, it did not belong to Wilson. It belonged to Kenneth Echols. The State argued to the jury that the print belonged to Echols and the officer was confused by the resemblance between Echols and Wilson. The Echols brothers and Wilson were found guilty of burglary. The supreme court reversed and held:

> "*[Wilson] contends that the facts of this case demonstrate such hostility between his interests and those of the Echols brothers that the public defender could not adequately represent all three. We agree, and hold that the public defender's representation of the Echols brothers prevented the public defender from loyally representing [Wilson], thereby denying [Wilson] the effective assistance of counsel guaranteed by the sixth and fourteenth amendments to the United States Constitution, and by section 8 of article I of our constitution (Ill. Const. 1970, art. I, sec. 8).*

> \* \* \*

> *[W]here such hostility [between defendants] is shown to exist, the joint representation of the conflicting interests denies a defendant the effective assistance of counsel, and such denial is presumed to be prejudicial.* [Citations.]

> \* \* \*

> Finally, [Wilson] also argues that *once the confusion occurred regarding the source of the fingerprint it became obvious that counsel could not give undivided loyalty to both Johnny Wilson and Kenneth Echols. We agree.* As the State now concedes, and as the public defender should have known, *the fingerprint on the window was not that of [Wilson].* None-

theless, the public defender resisted the State's and the court's efforts to make that fact clear. *Once the confusion occurred regarding the fingerprint, [Wilson's] interests and those of the Echols brothers diverged dramatically. It requires no speculation to reach the conclusion that competent, independent counsel* would have advised [Wilson] to resolve that confusion, and would have argued in closing that, on balance, given all of the evidence, [Wilson] never entered the tavern.

Thus, *there was a material hostility between the interests of [Wilson] and Kenneth Echols, and the public defender's commitment to Kenneth Echols prevented the public defender from representing [Wilson] with undivided loyalty. [Wilson] therefore was denied the effective assistance of counsel, which denial was prejudicial and was not waived by [Wilson's] silence."* People v. Echols (1978), 74 Ill. 2d 319, 326, 326-29. (Emphasis added.)

In *Echols*, the hostility between the defendants arose during the trial, out of the State's efforts to convict the defendants. In the case at bar, the hostility between the defendants occurred long before the trial, when they confessed and exculpated themselves and inculpated each other. Their antagonism was intensified throughout their joint trial. Their hostility before this court is therefore even more devastating.

In *People v. Nelson* (1980), 82 Ill. 2d 67, 411 N.E.2d 261, separate assistant public defenders represented the two defendants on their McLean County joint burglary charge. The defendant John Rogers pleaded guilty. On the defendant William Nelson's jury trial, the codefendant Rogers was called as a defense witness. Rogers had not been sentenced on his guilty plea, and he relied on his constitutional privilege against self-incrimination in refusing to answer the questions of Nelson's attorney. The jury found Nelson guilty. On appeal before the supreme court, Nelson argued for reversal that in the joint representation of the defendants by the public defenders in the trial court, there was a conflict of interest which denied his constitutional guarantee of the effective assistance of counsel. In *Nelson*, the supreme court disagreed with Nelson's contention, but in so doing stated:

"The rule, long established in this jurisdiction, is that a criminal defendant in need of representation is entitled to have appointed for him counsel who is free from adverse interests which might prejudice such representation. [Citation.] In furtherance of this principle, it has likewise long been held that *an attorney should not be required to represent codefendants*

*whose defenses are inconsistent, since to do so would inevitably prejudice the defense of at least one client.*

\*\*\*. The question to be addressed in cases where codefendants are jointly represented by one attorney or entity is whether there was an ' "actual conflict of interest manifested at trial." ' [Citations.] *Once such an actual conflict is identified, it is unnecessary for a defendant to demonstrate that prejudice resulted therefrom in order to sustain a finding of a violation of the right to counsel.* [Citations.] In formulating that rule, this court relied on *Glasser v. United States* (1942), 315 U.S. 60, 75-76, 86 L. Ed. 680, 702, 62 S. Ct. 457, 467, where it was said:

'To determine the precise degree of prejudice sustained \*\*\* is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.' " *People v. Nelson* (1980), 82 Ill. 2d 67, 71-73. (Emphasis added.)

As before stated, I do not resolve this conflict of attorney issue because the convictions should be reversed. The evidence is legally insufficient to establish that either defendant committed burglary or home invasion.

### III

The next *sua sponte* issue presented by this appeal is the validity of the trial court's denial of the defendants' severance motions. Section 114—8 (Ill. Rev. Stat. 1981, ch. 38, par. 114—8) provides:

"Motion for Severance. If it appears that a defendant or the State is prejudiced by a joinder of related prosecutions or defendants in a single charge or by joinder of separate charges or defendants for trial the court may order separate trials, grant a severance of defendants, or provide other relief as justice may require."

It is quite apparent from the contents of the defendants' confessions, their severance motions and the assistant State's Attorney's initial acquiescence in the defendants' severance motions that the defendants would be (and were in fact) prejudiced by their joint trial and that their severance motions should have been permanently allowed. Instead, the trial judge committed a grievous error when he shifted, abandoned his initial order, reversed himself and denied the severance motions.

The joint trial of the defendants was not only a contest between the State and the defendants, but it was also a lateral cross-accusation match between the defendants. The joint trial of the defendants was a mockery and farcical display of the adversary system between the State and the accused. It eviscerated the State's burden to prove the defendants' guilt beyond a reasonable doubt.

In the United States Supreme Court landmark decision of *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the question presented was "whether the conviction of a defendant at a joint trial should be set aside although the jury was instructed that a codefendant's confession inculpating the defendant had to be disregarded in determining his guilt or innocence." Bruton and Evans were jointly tried before a jury on a Federal charge of armed postal robbery. A postal inspector testified that Evans orally confessed to him that he and Bruton committed the robbery. Pursuant to *Delli Paoli v. United States* (1957), 352 U.S. 232, 1 L. Ed. 2d 278, 77 S. Ct. 294, the trial judge instructed the jury that Evans' confession was inadmissible hearsay against Bruton and had to be disregarded in determining Bruton's innocence or guilt. The court of appeals affirmed. The Supreme Court overruled *Delli Paoli* and reversed, holding:

> "[B]ecause of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment.
>
> *** [I]n *Pointer v. Texas*, 380 U.S. 400, we confirmed 'that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him' secured by the Sixth Amendment, *id.*, at 404; 'a major reason underlying the constitutional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses against him.'
>
> *** Plainly, the introduction of Evans' confession added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since Evans did not take the stand. [Bruton] thus was denied his constitutional right of confrontation.
>
> * * *
>
> Here the introduction of Evans' confession posed a substantial threat to [Bruton's] right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly

clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating [Bruton], in the context of a joint trial *we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination.* The effect is the same as if there had been no instruction at all." (Emphasis added.) *Bruton v. United States* (1968), 391 U.S. 123, 126-28, 137, 20 L. Ed. 2d 476, 479-80, 485, 88 S. Ct. 1620, 1622-23, 1628.

In *People v. Miller* (1968), 40 Ill. 2d 154, 238 N.E.2d 407, the motion of defendant Babitsch for a separate trial from his codefendant Miller on the ground that Miller had made a post-arrest statement incriminating Babitsch was denied. The trial court ordered the prosecutor to delete from Miller's statement any reference to Babitsch. Nevertheless the officer who arrested Miller testified that Miller denied committing the abortion for which the defendants were on trial, but that Miller admitted that defendant Babitsch performed the abortion and said, 'We spent the money." The supreme court reversed and held:

"The defendant Babitsch argues that the court should have granted a severance because of the incriminating statement of Miller and also that the admission in evidence of this incriminating statement constituted prejudicial error. *It is the rule that when a motion for separate trial is based on the fact that a co-defendant's confession implicates the moving defendant a severance should be granted* unless the prosecution declares that the admission will not be offered in evidence at the trial, or if offered that there will be eliminated therefrom any and all reference to the party applying for a severance. (*People v. Clark,* 17 Ill. 2d 486, 490.) In the *Clark* case a severance was granted but a confession of a co-defendant implicating the defendant was admitted in evidence with a cautionary instruction that it should not be considered by the jury insofar as the defendant's guilt was concerned. We held that the admission of such evidence was reversible error in spite of the cautionary instruction.

\*\*\*. In the present case, Babitsch had requested a severance based upon the possibility that Miller's statement incriminating him might be admitted in evidence. The court denied the request for a separate trial and the very thing which Babitsch had feared occurred. The testimony of the officer that Miller told him that Babitsch performed the abortion was so highly prejudicial to Babitsch that a new trial is required. The State contends that the jury was properly admonished not to consider the evidence. Even if the ruling on evidence on which the State relies could be so con-

strued, the prejudicial effect of the testimony would remain and would be sufficient to require reversal." (Emphasis added.) *People v. Miller* (1968), 40 Ill. 2d 154, 158-59, 238 N.E.2d 407.

Antagonistic defenses were assigned as the grounds for severance motions in *People v. McVay* (1981), 98 Ill. App. 3d 708, 424 N.E.2d 922, *People v. McMullen* (1980), 88 Ill. App. 3d 611, and *People v. Jones* (1980), 81 Ill. App. 3d 724, 401 N.E.2d 1325. The conviction in each case was reversed because the trial judge denied the severance motion. The following language of the court in *McVay* is applicable to the instant case:

> "The rules concerning severance in this situation are well delineated and of long standing authority, expressed as follows:
>
> '*** Confessions or admissions made by an accomplice outside the presence of a defendant are not admissible against the latter whether or not the parties are jointly tried, and we have repeatedly held that when a motion for separate trial is based on the fact that a codefendant's confession implicates the moving defendant, a severance should be granted unless the prosecution declares that the admissions or confessions will not be offered in evidence at time of trial, or if offered, that there will be eliminated therefrom any and all reference to the party applying for a severance. ***.' (*People v. Clark* (1959), 17 Ill. 2d 486, 489-90, 162 N.E.2d 413; *People v. Miller* (1968), 40 Ill. 2d 154, 158-59, 238 N.E.2d 407.)
>
> In both *Clark* and *Miller*, the supreme court reversed the convictions based upon the trial court's failure to grant a defense motion for a severance where admissions by a co-defendant implicated the defendant. Also, in both cases, the court concluded that reversal was required despite a cautionary instruction given concerning the evidence. [Citations.] As noted by the court in *Clark*, '*** despite the court's efforts to prevent injustice by cautionary instructions as to limitations on the evidence, the prejudicial effect of the codefendant's confessions inevitably remained. ***.' [Citation.] *The basis for this long-standing rule requiring severance in such situations is the constitutional guarantee of a fair and impartial trial and the conclusion, founded on the plainest principles of justice*, that admission of a co-defendant's statement implicating the other party defendant works a substantial and unfair prejudice on the other party. [Citations.]
>
> ***

While the severance rule established and stated in *Bruton* [citation] rested on a defendant's right to cross-examination as secured

by the confrontation clause, *the Illinois rule requiring severance in such situations far antedates Bruton and is premised upon fundamental principles of justice and the defendant's right to a fair trial and not merely upon a violation of the right to confront adverse witnesses.* [Citations.] Even with the ability to cross-examine, the prejudice to a defendant from the incriminating admission by a codefendant remains, and a severance should be granted." (Emphasis added.) *People v. McVay* (1981), 98 Ill. App. 3d 708, 715-17.

*Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132, decided three years before *McVay*, does not validate denial of the defendants' severance motions and their unfair joint trial. In *Parker*, the defendants' confessions were found by the court to "interlock," for which reason the court held the defendants' severance motions were properly denied and that the defendants were not prejudiced by their joint trial. The opinion does not reveal whether there were any contradictions in the conduct attributed to the defendants in the commission of the offenses in the different confessions, however. Whether confessions (like the confessions in the instant case) which reveal that no violence was prearranged and which attributed infliction of the unplanned fatal blow to a codefendant, can be considered "interlocking" confessions was not decided in *Parker*.[6] In addition, in the case at bar, unlike in *Parker*, the defendants' confessions and the defense attorneys' cross-examination and arguments to the jury were flagrant, prejudicial and inflammatory efforts to exculpate one defendant by shifting commission of the offenses to the other defendant. (See Appendices A, B, E, F and G). Moreover, in *Parker*, unlike in the case at bar, each confession was subjected to a process of redaction in which references to the other defendant were replaced with the words "blank" or "another person."

In the case at bar, the defendants' severance motions should have been allowed. They were irreparably prejudiced by their joint trial. Their convictions should therefore be reversed.

## IV

This cause should not be remanded for a new trial, however, for the reason that the State's evidence on which the defendants' guilty findings are predicated is legally insufficient and utterly fails as a matter of law

---

[6]*People v. Sanders* (1981), 103 Ill. App. 3d 700, 431 N.E.2d 1145, which cited *Parker* as authority, relied on the "interlocking confession" doctrine as the basis for affirming the defendants' convictions. In *Sanders*, during the trial the defendants were not required to defend against each other, as they were in the case at bar. *Sanders* is not authority for the defendants' joint prejudicial and inflammatory trial in the case at bar.

to establish either defendant's guilt of burglary or home invasion. The State's enhanced opportunity to obtain guilty findings of murder against the defendants by their joint trial met with failure. The jury determined, within its province, that the evidence did not prove either defendant guilty of murder beyond a reasonable doubt and found both not guilty, perhaps because of the three conflicting versions by Lopez, Racanelli and Watters of Reynold's fatal stabbing. Although speculation on the reason for the jury's verdicts of not guilty of murder may satisfy a curiosity, such conjecture is otherwise unproductive.

The defendants were also charged with armed robbery. (Ill. Rev. Stat. 1979, ch. 38, par. 18—2.) Section 18—2 provides that, "A person commits armed robbery when he or she [takes property from the person or presence of another by the use of force or by threatening the imminent use of force] while he or she carries on or about his or her person, or is otherwise armed with a dangerous weapon." Although there may have been sufficient evidence presented to the jury on which it could have found the defendants guilty of armed robbery of Robert Reynolds beyond a reasonable doubt, the State nevertheless elected to nol-pros the armed robbery charge.

There was also a theft charge against the defendants. (Ill. Rev. Stat. 1979, ch. 38, par. 16—1.) Section 16—1 provides, "A person commits theft when he knowingly: (a) obtains or exerts unauthorized control over property of the owner; or *** (c) obtains by threat control over property of the owner; *** and (1) intends to deprive the owner permanently of the use and benefit of the property ***." There may also have been ample evidence presented to the jury on which the jury could have found the defendants guilty of theft of Robert Reynolds' property beyond a reasonable doubt; yet, the State chose to nol-pros the theft charge as well. To engage in suppositions or theories for the State's declination to prosecute the theft and armed robbery charges would not be beneficial.

The State in exercise of its prosecutorial discretion chose to proceed against the defendants only on the murder, burglary and home invasion charges. The burglary charge, in pertinent part, was as follows:

"That on August 21, 1981 at and within said county Joseph G. Racanelli and Johnnie Watters committed the offense of burglary in that *they without authority, knowingly entered into a building, to wit dwelling of Robert Reynolds with the intent to commit the crime of theft therein,* in violation of ch. 38, sec. 19—1 of the Ill. Rev. Stat. 1979 as amended." (Emphasis added.)

The burglary statute (Ill. Rev. Stat. 1979, ch. 38, par. 19—1), which the defendants allegedly violated, provides:

"A person commits burglary when *without authority he know-*

*ingly enters or without authority remains within a building* \*\*\* with intent to commit therein a felony or theft." (Emphasis added.)

The home invasion allegation was that on August 21, 1981, Racanelli and Watters:

> "Committed the offenses of home invasion in that they, not being peace officers acting in the line of duty, *without authority knowingly entered the dwelling place of Robert Reynolds*, knowingly and had reason to know that one or more persons were present therein, intentionally stabbed and killed Robert Reynolds, within said dwelling place, with a knife, in violation of ch. 38, sec. 12—11(a)(2) of the Ill. Rev. Stat. 1979, as amended." (Emphasis added.)

The home invasion statute (Ill. Rev. Stat. 1979, ch. 38, par. 12—11(a)(2)) provides:

> "A person who is not a peace officer acting in the line of duty commits home invasion *when without authority he or she knowingly enters the dwelling place of another* when he or she knows or has reason to know that one or more persons is present and \*\*\* (2) Intentionally causes any injury to any person or persons within such dwelling place." (Emphasis added.)

From the foregoing statute, it is manifest that one of the essential elements of the offenses of burglary and home invasion is the entry into a dwelling (or other edifice) *without authority. (People v. Clark* (1964), 30 Ill. 2d 216, 219, 195 N.E.2d 631; *People v. Sansone* (1981), 94 Ill. App. 3d 271, 273, 418 N.E.2d 862; *People v. Bailey* (1980), 80 Ill. App. 3d 242, 244, 399 N.E.2d 724; and *People v. Harris* (1975), 33 Ill. App. 3d 600, 338 N.E.2d 129.) As the Illinois Supreme Court recently expressed in *People v. Del Percio* (1985), 105 Ill. 2d 372, 374, "The State failed to allege that the defendant entered the victim's home without authority, a necessary and material element of home invasion."

The defendants in the case at bar were charged with entering Reynolds' dwelling without authority. Yet, not one iota of evidence was presented to the jury that Racanelli or Watters entered Reynolds' dwelling without authority. In fact, the State's evidence affirmatively established that Racanelli's entry into Reynolds' dwelling was with authority and by Reynolds' invitation. Lopez' complete testimony of Racanelli's entry into Reynolds' apartment was as follows:

> "Q. When you first went to Robert Reynolds' apartment, who was there?
>
> A. Just Robert Reynolds.

\* \* \*

Q. And then did anyone else later come to the apartment?

A. Yes.

Q. And who was that?

A. Joey Racanelli.

\* \* \*

Q. Now, after defendant Racanelli came into Robert Reynolds' apartment, on the evening of August 20th, what did you do?

A. I went to bed.

\* \* \*

Q. And what did you do after you went to the bedroom?

A. I went to sleep.

Q. About what time would you estimate this to be?

A. About 10:30."

The only other evidence in the record on Racanelli's entry into Reynolds' apartment is Racanelli's confession which was admitted into evidence through the testimony of Assistant State's Attorney Kaiser. Racanelli stated in his confession that he was in Reynolds' apartment at Reynolds' invitation, as follows:

Q. \* \* \* Okay, Joseph, on the night of August 21, 1981, who were you with that evening?

A. Johnnie Watters.

Q. And what did you and Johnnie Watters decide to do at that time?

A. Rob the man's house.

Q. How did you decide that you were going to do this?

A. I went over and started drinking with him.

Q. Did you both go over to his house?

A. Not at first. I did.

Q. This was part of your plan, is that right?

A. Yes.

Q. You were going to drink with him?

A. Not at that time, I was not planning it because he had invited me to drink with him.

Q. But, you and Johnnie Watters then decided to rob Mr. Reynolds?

A. Yes.

Q. Now, how much did you and Mr. Reynolds drink?

A. About a quart of Baccardi.

Q. What happened after you drank that? What did Mr. Reynolds do?

A. After he got drunk, he went to sleep.

Q. What did you do then?

A. I was talking to somebody on the phone and I gave him a half hour to make sure he was asleep.

Q. What did you do then?

A. I called Johnnie Watters over.

Q. Where was he when you called him?

A. Over to Johnny Lopez' house.

Q. When Johnnie Watters came over, what did you and him do?

A. We started unplugging the TV and the stereo and stuff and set them by the door."

From Racanelli's confession, it is apparent that he did not enter Reynolds' apartment via a ruse or subterfuge, nor did he induce Reynolds' invitation; rather, he entered at Reynolds' "motivated" invitation. Racanelli imbibed in intoxicants with Reynolds over an extended period. It was sometime after Racanelli had entered the apartment and Reynolds had become inebriated and gone to sleep that Racanelli and Watters planned to covertly pilfer Reynolds' property. Racanelli's confession was given freely and voluntarily, according to the testimony of Assistant State's Attorney Kaiser, and the trial court so found. Although the circumstances of Racanelli's entry into Reynolds' apartment are relatively clear, any ambiguity in Racanelli's confession regarding his entry should have been clarified by the interrogatory skills of this trained prosecuting attorney. His failure to have done so cannot be held against Racanelli.

There is no competent evidence in the record which establishes how Watters entered Reynolds' apartment. The State was obligated to prove beyond a reasonable doubt that Watters' (and Racanelli's) entry was *without authority*. Instead, the record is silent on Watters' entry.

Lopez testified that he awakened the following morning in Reynolds' apartment. He testified:

"Q. And what if anything did you see when you woke up?

A. I woke up and I saw Robert Reynolds and Johnnie Watters in the bedroom.

Q. And would you describe what Robert Reynolds was like what you first saw him, when you woke up?

A. He was staggering around the floor, with a stab wound in his back."

Lopez did not utter a single testimonial word on Watters' entry into Reynolds' apartment. Lopez' mere testimony of Watters' *presence* in the apartment does not satisfy the requirement of proof beyond a reasonable doubt that *Watters entered the apartment without authority*.

Watters gave a written, signed confession to Assistant State's Attorney Francis J. Mahon, Jr., and Mahon testified that Watters did so freely

and voluntarily and with a thorough understanding and a knowing waiver of his *Miranda* rights. Thus, there were no restrictions or inhibitions to curb Mahon's inquiry of Watters. Yet, Mahon did not ask Watters a single question on Watters' mode of entry into Reynolds' apartment, whether by invitation or force, or whether it was with or without authority. Mahon inquired of Watters during his confession as follows:

"Q. On August 21st, 1981, *were you in the apartment of Robert Reynolds* at 4240 North Clarendon at about 5:30 in the morning?

A. Yes.

Q. What were you doing there?

A. I was robbing, taking some speakers and stuff." (Emphasis added.)

Racanelli stated in his confession that after Reynolds "got drunk [and] went to sleep," he "called Johnnie Watters over [and they] started unplugging the TV and the stereo and stuff and set them by the door." It need not be decided whether, from Racanelli's confession, Racanelli could authorize Watters' entry into Reynolds' apartment because Racanelli's confession was not admissible as evidence against Watters. Racanelli's confession was admissible as evidence *only against Racanelli.* No man can confess for another. The trial judge correctly so instructed the jury: "A statement made by one defendant may not be considered by you against any other defendant."

In *Bruton v. United States* (1968), 391 U.S. 123, 128 n.3, 20 L. Ed. 2d 476, 480 n.3, 88 S. Ct. 1620, 1623 n.3, the Supreme Court commented on the inadmissibility of a codefendant's confession as evidence against Bruton as follows: "We emphasize that [the codefendant's] hearsay statement inculpating [Bruton] was clearly inadmissible against [Bruton] under traditional rules of evidence, [citations]." The Illinois Supreme Court in *People v. Clark* (1959), 17 Ill. 2d 486, 490, 162 N.E.2d 413, stated that "[c]onfessions or admissions made by an accomplice outside the presence of a defendant are not admissible against the latter whether or not the parties are jointly tried ***." Accordingly, in the case at bar the means via which Watters entered Reynolds' apartment as set forth in Racanelli's confession is inadmissible against Watters. There remains then only Lopez' testimony and Watters' confession about the circumstances of Watters' entry into Reynolds' apartment. Both are silent on this subject. Thus, the State's evidence legally fails to establish that the defendants committed burglary or home invasion.

The majority opinion acknowledges that (1) "The material elements of the offense of burglary are entry into a building without authority"; (2) "Defendants' entry into the victim's apartment [was] initially with the victim's authority"; and (3) "Home invasion is the entry without author-

ity of the dwelling place of another." The majority, however, necessarily resorted to phantasmagoric rationale to affirm the burglary and home invasion convictions. The majority holds that "Defendants' entry into the victim's apartment, although initially with the victim's authority, exceeded that authority when they attacked the victim and removed his property. *** Therefore, defendants' presence in the apartment was without authority once they attacked the victim and removed his belongings from the apartment." The majority magically concludes that the defendants entered Reynolds' apartment without authority and that, therefore, the defendants were proved guilty beyond a reasonable doubt of burglary and home invasion.

The majority's reliance on *People v. Hudson* (1983), 113 Ill. App. 3d 1041, 448 N.E.2d 178, is misplaced. *Hudson* relied on *People v. Fisher* (1980), 83 Ill. App. 3d 619, 623, 404 N.E.2d 859, as authority. The court pointed out in *Fisher* (which also occurred in *Hudson*), that "[d]efendants' entry that evening was gained as a result of misrepresentation and subterfuge. *** [The residents] were deceived into allowing defendants into their apartment, and such entry was not in accordance with the will of the occupants and is therefore unauthorized." The court concluded in *Hudson* and *Fisher* that even though the entry into the apartment was initially by invitation, because such invitation was obtained by subterfuge, the entry was without authority. Also in *Hudson* and *Fisher*, it was promptly *after* the defendants' surreptitiously induced invitation into the apartment that the defendants threatened the residents with firearms and ransacked the premises. In the instant case, Reynolds was not deceived into allowing defendants into his apartment. The entry into Reynolds' dwelling was not gained surreptitiously by misrepresentation or subterfuge, nor was Reynolds' invitation induced by Racanelli or Watters. In *Hudson* and *Fisher*, the defendants planned to rob the owners before they entered the premises. They deceived the owners into extending them an invitation into the dwelling in order to accomplish their purpose. Such are not the facts in the instant case. *Hudson* and *Fisher* are therefore grossly inapposite to the instant case.

A recent case, *People v. Sanders* (1984), 129 Ill. App. 3d 552, 472 N.E.2d 1156, is also inapposite to the case at bar. In *Sanders*, there was competent evidence which established that Macon, the invited guest in the home, admitted Sanders and the other defendants into the McGee dwelling to rob the McGee family. As before stated, there is no competent evidence in the instant case which established the circumstances of Watters' entry into Reynolds' dwelling. If the court in *Hudson, Fisher* and *Sanders* intended by judicial interpretation to repeal the requirement of "entry into a dwelling without authority" from the offense of home

invasion, such is the exclusive responsibility of the legislature and not the courts. Furthermore, the title of the offense, *"Home Invasion,"* coupled with the expressed requirement that the entry be *"without authority,"* unequivocally establishes that the entry into the dwelling be by *"Invasion."* The court by judicial fiat in *Hudson, Fisher* and *Sanders,* however, has attempted to rewrite and change the offense from *"Home Invasion"* to *"Home Invitation."*

It is obvious that the State erred in its selection of which charges to nol-pros and which charges to prosecute. Unfortunate as this may be, it was the State's choice, and it is not the function, duty or responsibility of this court to rectify or correct such prosecutorial misjudgments. Because the evidence, as a matter of law, fails to establish that the defendants committed the offense of burglary or home invasion, their convictions should be reversed.

## V

Joseph Racanelli contends before this court that his statements and confessions were obtained from him in violation of his State and Federal constitutional right to the assistance of counsel. On the evidentiary hearing of his motion to suppress his statements and confessions, it was established that Chicago police detective Ford signed a complaint for examination, in which Racanelli apparently was charged with the murder of Reynolds. On September 3, 1981, Detective Ford appeared before and presented the complaint to circuit court Judge Murphy, who issued a warrant for Racanelli's arrest. All the statements and confessions were extracted from Racanelli after the murder complaint had been filed against him and after Judge Murphy had issued the warrant for his arrest. Therefore, Racanelli urges, his statements and confessions were obtained from him *after* adversarial judicial proceedings had been instituted against him, without benefit of his counsel, in violation of his constitutional right.

It is provided in the sixth amendment to the Constitution of the United States that "In all criminal prosecutions, the accused shall enjoy the right *** to have the assistance of counsel for his defense." This sixth amendment constitutional right to the assistance of counsel "in all criminal prosecutions" is made obligatory and binding on the States by the fourteenth amendment to the United States Constitution, which states, "Nor shall any state deprive any person of life, liberty or property, without due process of law." (*Gideon v. Wainwright* (1963), 372 U.S. 335, 342, 9 L. Ed. 2d 799, 804, 83 S. Ct. 792, 795.) Section 8 of article 1 of the Illinois Constitution provides, "In criminal prosecutions, the accused shall have the right to appear and defend in person and by

counsel; \*\*\*." Ill. Const. 1970, art. I, sec. 8.

The trial judge did not properly address Racanelli's constitutional right to counsel argument when he denied his motion to suppress his confession. Indeed, the trial judge tacitly intertwined Racanelli's constitutional right to counsel with his Federal and State constitutional right against self-incrimination and his right to *Miranda* warnings thereunder. But this inextricable maneuver did not resolve this simple issue. The trial judge reasoned:

> "\*\*\* [A]s far as the adversary proceedings and the Sixth Amendment, \*\*\* [Racanelli] was informed that he had a right to consult with a lawyer, that he had a right to have a lawyer present during his interrogation. I mean, what else does the police department then have to do, bring in a lawyer and say, well this man is a lawyer. Do you want this man to represent you during our interrogation. I don't think any case law goes that far. \*\*\*. The motion will be denied."

The rationale by which the majority affirms this ruling is predicated on erroneous legal concepts. The majority holds that at the time Racanelli made his statements and confessions, his constitutional right to counsel had not yet attached because adversarial judicial proceedings had not been instituted against him. The majority reasons:

> (1) "Only the State's Attorney has the authority to file a felony charge."

> (2) "[T]he State cannot be said to have filed a formal charge committing itself to the prosecution of Racanelli simply with the filing of a complaint by a police officer."

> (3) "[T]he complaint was not filed at the request of the State's Attorney."

> (4) "We therefore find that Racanelli's right to counsel did not apply to the telephone conversation and that his sixth amendment right to counsel was not violated."

There is not one iota of evidence in the record as to whether Detective Ford did or did not file the complaint against Racanelli "at the request of the State's Attorney."

The majority opinion incorrectly states, "Illinois law provides that felony prosecutions *must* be commenced by indictment or information and not by complaint." (Emphasis added.) Section 111—1 of the Illinois Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 111—1) provides, "\*\*\* a prosecution *may* be commenced by (a) a complaint; (b) an information; (c) an indictment." (Emphasis added.) It is provided in section 111—2(a) (Ill. Rev. Stat. 1979, ch. 38, par. 111—2(a)), that "All prosecutions of felonies shall be by information or by indict-

ment." But this statute does *not* provide "that felony prosecutions *must* be commenced by indictment or information and not by complaint," as the majority states. In fact, section 111—2(a) further provides, "No prosecution may be pursued by information unless a preliminary hearing has been held or waived *** and at that hearing probable cause to believe the defendant committed an offense was found, and the provisions of section 109—3.1 of this Code have been complied with." Section 111—2(b) provides, "All other prosecutions may be by indictment, information or complaint." Ill. Rev. Stat. 1979, ch. 38, par. 111—2(b).

Section 111—3(b) (Ill. Rev. Stat. 1979, ch. 38, par. 111—3(b)) provides, "An indictment shall be signed by the foreman of the Grand Jury and an information shall be signed by the State's Attorney ***. *A complaint shall be sworn to and signed by the complainant ***.*" (Emphasis added.)

It is provided in section 109—1 (Ill. Rev. Stat. 1979, ch. 38, pars. 109—1(a), (b)(2), (b)(3)) that, "[a] person arrested on a warrant shall be taken without unnecessary delay before [a] judge *** [and] *the judge shall *** advise the defendant of his right to counsel and if indigent shall appoint a public defender or licensed attorney* at law of this State to *represent him **** [and shall] hold a preliminary hearing in those cases where the judge is without jurisdiction to try the offense. ***." (Emphasis added.)

A preliminary examination is provided for in section 109—3(a) (Ill. Rev. Stat. 1979, ch. 38, par. 109—3(a)), which states, "The judge shall hold the defendant to answer to the court having jurisdiction of the offense if from the evidence it appears there is probable cause to believe an offense has been committed by the defendant, *** if the offense is a felony."

*People v. Pankey* (1983), 94 Ill. 2d 12, 445 N.E.2d 284, is not authority for the majority's holding that "only the State's Attorney has authority to file a felony charge ***." In *Pankey,* the arresting officer filed, on a uniform citation used for traffic offenses, an inadequate and legally defective charge of aggravated battery against the defendant. Later that day, under extremely suspicious circumstances, the defendant appeared before the court, and in the absence of a representative from the State's Attorney's office, entered a plea of guilty and was fined $50 plus costs. The following day, the State's Attorney filed an information, sworn to by the arresting officer, which properly charged the aggravated-battery offense. The defendant moved to dismiss the information on double jeopardy grounds. The State's Attorney contended that defendant's former prosecution under the invalid information was procured by the defendant without the knowledge of the proper prosecuting office and that prosecu-

tion of the defendant therefore was not barred under the subsequent valid information. The court pointed out that "[t]he State's Attorney, as a representative of the People of the State of Illinois, has the duty '[t]o commence and prosecute all actions, suits, indictments and prosecutions, civil and criminal, in the circuit court for his county, in which the people of the State or county may be concerned.' (Ill. Rev. Stat. 1979, ch. 14, par. 5(1).)" (*People v. Pankey* (1983), 94 Ill. 2d 12, 16.) The court held that the trial court did not acquire jurisdiction over the State in the original guilty plea proceedings because the State's Attorney was not present, knew nothing of and did not acquiesce in the proceedings. The court also held that the police officer was without authority to *prosecute* the charge and therefore the double jeopardy clause of the State and Federal constitutions (U.S. Const., amend. V; Ill. Const. art. I, sec. 10) did not bar the subsequent prosecution. *Pankey* is not authority for the majority proposition that "only the State's Attorney has the authority to file a felony charge." Accordingly, the previously set forth assertions of the majority are clearly erroneous. The trial court erred in holding that Racanelli's *telephone conversations* and *subsequent confessions* were not obtained in violation of the defendant's State and Federal constitutional right to counsel. The majority here likewise err in affirming the trial court's erroneous ruling.

*Escobedo v. Illinois* (1964), 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758, is initially the appropriate authority for Racanelli's contention that his statements and confessions were obtained in violation of his right to counsel. In *Escobedo*, the defendant was in police station custody. His request to see his lawyer and his lawyer's police station request to see Escobedo were denied. Escobedo's motion to suppress his confession, which was made after the aforesaid denials, was overruled. The Supreme Court pointed out that "[t]he interrogation here was conducted before petitioner was formally indicted. But in the context of this case, that fact should make no difference." (378 U.S. 478, 485, 12 L. Ed. 2d 977, 982, 84 S. Ct. 1758, 1762.) So it is in the case at bar. Also, in *Escobedo*, the court pointed out further, "Petitioner had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so." (378 U.S. 478, 485, 12 L. Ed. 2d 977, 982, 84 S. Ct. 1758, 1762.) The Supreme Court further held:

> "The 'guiding hand of counsel' was essential to advise petitioner of his rights in this delicate situation. *Powell v. Alabama*, 287 U.S. 45, 69. This was the 'stage when legal aid and advice' were most critical to petitioner. [Citation.] It was a stage surely as critical as was the arraignment in *Hamilton v. Alabama*, 368 U.S. 52, and the preliminary hearing in *White v. Maryland*, 373 U.S. 59.

What happened at this interrogation could certainly 'affect the whole trial,' *Hamilton v. Alabama, supra,* at 54, since rights 'may be as irretrievably lost, if not then and there asserted, as they are when an accused represented by counsel waives a right for strategic purposes.' *** *It would exalt form over substance to make the right to counsel, under these circumstances, depend on whether at the time of the interrogation, the authorities had secured a formal indictment. Petitioner had, for all practical purposes, already been charged with murder."* (Emphasis added.) 378 U.S. 478, 486, 12 L. Ed. 2d 977, 983, 84 S. Ct. 1758, 1762.

In the case at bar, Racanelli had in fact been charged with murder and he was the accused in allegations pending in a judicial tribunal. Under these circumstances, it was a violation of his constitutional right to counsel to interrogate him in the absence of his counsel.

The treasured constitutional right to counsel should not be abridged by the rhetorical manipulation of the point at which adversarial judicial proceedings are initiated, from the filing of a complaint to the return of an indictment, in order to salvage an illegally extracted confession. The Supreme Court stated in *Kirby v. Illinois* (1972), 406 U.S. 682, 688, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881:

"In a line of constitutional cases in this Court stemming back to the Court's landmark opinion in *Powell v. Alabama,* 287 U.S. 45, it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him."

The filing of the complaint in the case at bar by Chicago police detective Ford before Judge Murphy, which charged Racanelli with Reynolds' murder, and the judge's issuance of a warrant for Racanelli's arrest thereon, elevated Racanelli from a police investigation suspect to an adversarial judicial defendant, and at that time Racanelli's constitutional right to counsel attached.

The defendants were displayed to crime witnesses in post-indictment lineups, without the benefit of their counsel's presence in *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and *Gilbert v. California* (1967), 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951. The Supreme Court in both cases held that such post-indictment proceedings were a critical stage of the criminal prosecution and, when conducted in the absence of a defendant's counsel, denied the defendant his sixth and fourteenth amendment rights to counsel, thus necessitating suppression of the lineup and in-court identification.

In *Kirby v. Illinois* (1972), 406 U.S. 682, 684, 32 L. Ed. 2d 411, 414,

92 S. Ct. 1877, 1879, the Supreme Court was asked "to extend the *Wade-Gilbert per se* exclusionary rule to identification testimony based upon a police station showup that took place *before* the defendant had been indicted or *otherwise formally charged with any criminal offense.*" (Emphasis added.) The Supreme Court declined to do so. In the case at bar, however, Racanelli *had* been formally charged with a criminal offense in a complaint for preliminary examination. The formal charge against and the arrest of Racanelli were not "a routine police investigation" as was the defendants' identification in *Kirby*. The following language of the Supreme Court in *Kirby* is most applicable to Racanelli:

> "*The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice.* For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. *It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable.*" (Emphasis added.) 406 U.S. 682, 689-90, 32 L. Ed. 2d 411, 417-18, 92 S. Ct. 1877, 1882.

In the case at bar, "the initiation of judicial criminal proceedings" was the filing by Detective Ford of the complaint which charged Racanelli with murder before the judge who issued the warrant for Racanelli's arrest. It was the "starting point of our whole system of adversary criminal justice."

In *People v. Burbank* (1972), 53 Ill. 2d 261, 272, 291 N.E.2d 161, the defendant had not been charged with murder when he was identified as the offender in a lineup. The supreme court held his right to counsel therefore had not attached. The supreme court additionally held, however:

> "The [Supreme] Court enumerated 'formal charge, preliminary hearing, indictment, information, or arraignment' [In *Kirby v. Illinois*] as ways of initiating adversary judicial criminal proceedings. This [*Kirby*] decision requires that the holding in *Palmer* be modified and broadened to apply *the Wade and Gilbert rule [of right of counsel] to not only post-indictment lineups but to lineups conducted after the initiation of adversary judicial criminal proceedings against an accused by whatever means.*" (Emphasis added.) *People v. Burbank* (1972), 53 Ill. 2d 261, 272, 291 N.E.2d 161.

The majority holds in the case at bar that Racanelli's right to counsel

attached only upon the return of the indictment and that his right to counsel did not attach upon the *"initiation of adversary judicial criminal proceedings against an accused by whatever means,"* i.e., *upon the filing of the murder complaint against Racanelli before Judge Murphy.* (Emphasis added.) This contention is in direct contravention to and absolutely ignores the holding of the supreme court in *Burbank.*

Furthermore, in *People v. Marshall* (1977), 47 Ill. App. 3d 784, 786, 365 N.E.2d 367, this court held:

> "Defendant initially contends that the trial court erred in denying his motion to suppress the lineup identifications because such identifications were effected after a charge had been placed against the defendant and at a time when the defendant was not represented by counsel. The record reveals that on January 30, 1973, defendant was arrested and identified in a lineup and that during this lineup defendant was not represented by counsel. Approximately one week before this lineup, a complaint for preliminary examination charging defendant with armed robbery and an arrest warrant had been issued.
>
> In *Kirby v. Illinois* [citation], the United States Supreme Court held that the requirement of presence of counsel at a lineup extends to any 'adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' Relying on *Kirby*, this court in *People v. Hinton* [citation], held that the *issuance of a complaint, followed by an arrest warrant and the actual arrest of the defendant was a 'formal charge' within the purview of Kirby and required the presence of counsel at the lineup. We similarly believe, in the instant case, at the time of the lineup adverse judicial proceedings had begun and that defendant should have been afforded counsel."* (Emphasis added.)

The holding of this court in the case at bar is in direct conflict with the court's holding in *Marshall.*

The majority also holds that "the rule of *Owens* is not applicable to the instant case." In *People v. Owens* (1984), 102 Ill. 2d 88, 101, 464 N.E.2d 261, the defendant was arrested on a Will County court warrant on a murder charge. Without counsel, he confessed. His suppression motion was overruled. A jury found him guilty. On appeal, the supreme court declined to decide the sixth amendment right to counsel issue, stating:

> "We note that, to date, neither the Supreme Court [citation] nor this court has resolved whether sixth amendment rights [to counsel] automatically attach upon the filing of a complaint. Nor do we

find it necessary to resolve that issue here ***." *People v. Owens* (1984), 102 Ill. 2d 88, 101, 464 N.E.2d 261.

The Supreme Court of the United States, however, held in *Moore v. Illinois* (1977), 434 U.S. 220, 228, 54 L. Ed. 2d 424, 433, 98 S. Ct. 458, 464, that *"[t]he prosecution *** was commenced under Illinois law when the victim's complaint was filed in court.* Ill. Rev. Stat., ch. 38, sec. 111 (1975)," and that the defendants' sixth amendment right to counsel attached at that time. In *Moore*, six days after rape and other sex offenses had been committed upon the victim in her home, the victim was taken by a police officer to court, where she signed a complaint which charged Moore with being her assailant. Later that day, when the defendant's case was called, the defendant appeared without counsel and the victim identified him as her attacker. The hearing was continued. The defendant was later indicted and his pretrial motion to suppress his identification by the victim was overruled. He assigned the ruling as error on his appeal. The Supreme Court of Illinois affirmed. In reversing, the Supreme Court of the United States held:

> "In *Kirby v. Illinois*, 406 U.S. 682 (1972), the plurality opinion made clear that the right to counsel announced in *Wade* and *Gilbert* attaches only to corporeal identifications conducted 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' 406 U.S., at 689. This is so because the initiation of such proceedings 'marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable.' *Id.*, at 690. Thus, in *Kirby* the plurality held that the prosecution's evidence of a robbery victim's one-on-one stationhouse identification of an uncounseled suspect shortly after the suspect's arrest was admissible because adversary judicial criminal proceedings had not yet been initiated.
>
> * * *
>
> The Court of Appeals *** read *Kirby* as holding that evidence of a corporeal identification conducted in the absence of defense counsel must be excluded only if the identification is made after the defendant is *indicted*. ***. Such a reading cannot be squared with *Kirby* itself, which held that *an accused's rights under Wade and Gilbert attach* to identifications conducted '*at or after the initiation of adversary judicial criminal proceedings,*' *including proceedings instituted 'by way of formal charge* [or] *preliminary hearing.*' 406 U.S., at 689. *The prosecution in this case was commenced under Illinois law when the victim's complaint was filed*

*in court. See Ill. Rev. Stat., ch. 38, sec. 111 (1975).*

\* \* \*

*Here, \*\*\* petitioner's Sixth Amendment rights were violated by a corporeal identification conducted after the initiation of adversary judicial criminal proceedings and in the absence of counsel."* (Emphasis added.) *Moore v. Illinois* (1977), 434 U.S. 220, 226-31, 54 L. Ed. 2d 424, 432-35, 98 S. Ct. 458, 463-66.

The majority holding in the case at bar directly contradicts the *Moore* holding. Racanelli's confession should have been suppressed under *Moore.*

In *People v. Harrell* (1982), 104 Ill. App. 3d 138, 142-43, 432 N.E.2d 1163, the defendant was identified in a lineup by the victim as her robbery assailant. The defendant sought suppression of this identification. The court held:

"[T]he right to counsel at a lineup attaches when adversary judicial criminal proceedings have been initiated against the defendant, 'by way of formal charge, preliminary hearing, indictment, information, or arraignment' [citation], or, as the Illinois Supreme Court has stated, *"by whatever means."* [Citation.] This last phrase, used in *Burbank*, was employed to show that the list of proceedings in *Kirby* is not exclusive. It does not dispense with the need for judicial proceedings as a prerequisite to the right to counsel \*\*\*. \*\*\* Sharp swore out a criminal complaint against the defendant, dated April 17, and an arrest warrant also issued that day. Based upon this testimony, uncontradicted by the defendant, it is not apparent whether the two judicially approved documents were obtained before or after the lineups. Since we cannot presume the existence of error which is not affirmatively shown of record [citation], we must resolve the silence of the record against the appellant. [Citation.] *The filing of a complaint and issuance of an arrest warrant against the defendant must therefore be treated as having occurred after the lineups. Thus, no adversary judicial proceedings had been instituted, and no right to counsel at the lineups had attached. For these reasons, the defendant's sixth amendment rights were not violated \*\*\*."* (Emphasis added.) *People v. Harrell* (1982), 104 Ill. App. 3d 138, 142-43, 432 N.E.2d 1163.

In the case at bar, the filing of the complaint and issuance of the arrest warrant against Racanelli occurred before his telephone conversations and confessions. Adversary judicial proceedings had been instituted and his right to counsel had attached when he talked to the officers and confessed. Racanelli's constitutional right to counsel was violated. His

conviction should therefore be reversed.

This court held in *People v. Giovannetti* (1979), 70 Ill. App. 3d 275, 282, 387 N.E.2d 1071:

"The law is clear that with the filing of the complaint charging Giovannetti with murder, defendant was entitled to counsel, a point which the State concedes, pursuant to *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877, and *People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161."

This court held in *People v. Faulkner* (1980), 86 Ill. App. 3d 136, 138-39, 407 N.E.2d 126:

"Faulkner first contends the trial court erred when it denied his motion to suppress identification testimony. He contends that his constitutional right to have counsel present during a lineup identification was activated by his arrest pursuant to a judicially issued warrant. In the absence of counsel, he concludes, any identification testimony resulting from the lineup should have been suppressed. We agree.

After Faulkner was charged by complaint with rape, he was entitled to counsel. [Citations.] Testimony regarding a lineup identification in violation of that entitlement is prohibited under *Gilbert v. California* (1967), 388 U.S. 263, 273, 18 L. Ed. 2d 1178, 1186, 87 S. Ct. 1951[, 1957]. Therefore, defendant's motion to suppress such testimony should have been granted."

This court held in *People v. Jumper* (1983), 113 Ill. App. 3d 346, 349, 447 N.E.2d 531:

"The right to counsel attaches upon the filing of a criminal complaint or information and the issuance of an arrest warrant."

This court held in *People v. Curtis & Ryder* (March 29, 1985), Nos. 83—2339 and 83—2395, slip op. at 9 and 10:

"Plainly, after the complaint is filed, the person charged has ceased being merely an accused, and he had, in fact, in every respect become a formal defendant in need of an attorney to protect his interests as a citizen at any subsequent critical stage of the criminal proceedings that are brought against him by the State. ***. [I]t would be incongruous to conclude that after a felony complaint is judicially approved and filed in the circuit court, adversarial judicial proceedings have not been commenced against a defendant 'by way of formal charge.' [Citations.]

Accordingly, we believe that adversarial judicial proceedings by way of formal charge in felony cases commence after the filing of a felony complaint in the circuit court. ***

Under the circumstances, since we believe that adversarial ju-

dicial proceedings had already been initiated against defendants before the lineups took place, we conclude that their sixth amendment right to assistance of counsel had already attached at the time of the lineups. This being so, defendants had a constitutional entitlement to the presence of counsel at the lineups ***."

This court's diametrically opposite holding in the case at bar that adversarial judicial proceedings were not initiated by the filing of the murder complaint against Racanelli, and that he was not constitutionally entitled to counsel when he talked to the officers and confessed, cannot be reconciled with this court's decisions previously set forth.

The State's resort to the judiciary, by the filing of the complaint against the defendant, as the forum within which to adjudicate and resolve the controversy between the State and the defendant, entitled the State to be represented by counsel, the State's Attorney, in that controversy. Under the Federal and State constitutions, the defendant, Racanelli, was also entitled to be represented by counsel in that controversy. Racanelli's right to counsel had attached when he talked to the officers and when he confessed. His constitutional right to counsel was violated by the admission of his illegally extracted, without counsel, confession as evidence against him. His conviction should therefore be reversed.

### APPENDICES

A. Excerpts of the cross-examination of State's witness Jimmy Lopez by assistant public defender John McNamara, attorney for defendant Joseph Racanelli:

"Q. You were arrested and the police told you they were going to charge you with this murder, did they not?

A. Yes.

Q. It was only after you had been arrested that you told them anything about *Johnnie Watters*, is that correct?

A. Yes.

Q. And they also told you at that time that they wanted Joseph Racanelli, did they not?

A. Yes.

\* \* \*

Q. \*\*\*. You told these ladies and gentlemen that *Johnnie Watters*, that man there, is the one who did the stabbing, is that correct?

A. Yes.

\* \* \*

Q. And *Johnnie [Watters]* and you are the only two people in

that room when that man was being stabbed, is that correct?

Q. Yes.

MR. McNAMARA: *Johnnie [Watters]* told you afterward, to put the padlock on the bedroom door, isn't that correct?

A. No.

Q. Well, do you remember talking with an Assistant State's Attorney, by the name of Mahon, M-a-h-o-n?

A. Yes.

Q. And that was September 2nd, 1981, at 1:38 in the afternoon, do you remember that?

A. Yes.

\* \* \*

Q. Do you remember the following question being asked and the following answer given?

'Q. BY MR. MAHON: Did *Johnnie Watters* tell you anything?

A. He told me when I left to put a lock on the door.

Q. Did you do that?

A. Yes.'

Do you remember those questions and those answers?

A. No.

Q. Is that the way it happened, did *Johnnie Watters* tell you to put the lock on the door and you put the lock on the door?

A. No.

\* \* \*

Q. And this is the knife that you saw *Johnnie Watters* stab Mr. Reynolds with, is that correct?

A. Yes.

Q. And again, when he stabbed Mr. Reynolds, you and *Johnnie Watters* were the only two other people in the room, is that correct?

A. Yes."

B. Excerpts of the cross-examination of State witness Jimmy Lopez by Brad Harris, attorney for defendant Johnnie Watters:

"Q. So from August 21 to August 2nd, a period of about two weeks, you didn't tell any police officer that you didn't do the stabbing or that Joseph Racanelli didn't do the stabbing, but that Johnnie Watters did it, is that right?

A. Yes.

Q. You are not related to Johnnie Watters, are you?

A. No.

Q. But you are related to *Joey Racanelli*, right?

A. Yes.

\* \* \*

Q. And Johnnie Lopez is your brother?

A. Yes.

Q. And his wife, Bertha, is she related to Joey Racanelli?

A. Yes.

Q. How?

A. That is *Joey Racanelli's* mother.

Q. Okay; and that is who you come to court with one time, *Joey Racanelli's* mother, right?

A. Not to here, no.

Q. But to court?

A. Yes.

\* \* \*

MR. HARRIS: Did you have a phone conversation with *Joey Racanelli* a couple of days after this incident, after the 21st?

A. Yes.

Q. And when was that?

A. Saturday.

Q. Two days after the 20th or the 21st?

A. Yes.

Q. And he called you at your father's place?

A. Yes.

\* \* \*

Q. Joey told you something to do regarding this case, right, on that conversation?

A. Yes.

\* \* \*

MR. HARRIS: What did he tell you to do?

A. He [*Racanelli*] told me to keep my mouth quiet, don't say nothing.

Q. And you listened to him, right?

A. Yes.

Q. Was that the first that that *he [Racanelli]* told you to keep quiet about it?

A. Yes.

Q. What about the morning that this happened, didn't he tell you to keep quiet about it then?

A. No.

Q. Jimmy, I want to ask you, so we are clear on this, did you ever tell any police officer that you had a three-way conversation with *Joey Racanelli* and your brother regarding this incident?

MR. DEVLIN: Objection, asked and answered, your Honor.

THE COURT: Yes, he said he never did, twice.

\* \* \*

Q. Then you testified, at some point, that evening *Joey* came over by himself, is that right?

A. Yes.

Q. *He* and Mr. Reynolds were drinking?

A. No.

Q. In any event, after *Joey* came over, you went in the bedroom, is that right?

A. Yes.

\* \* \*

THE COURT: Mr. Harris, I am aware that you are entitled to cross examination also but it is still discretionary with the court. And I am beginning to find we are going over the same material Mr. McNamara went over.

MR. HARRIS: Well, there is some overlapping.

THE COURT: Well, I don't think you should be, or the same two Defense lawyers go over the same material.

\* \* \*

Q. Now, I am going to ask you if you remember a couple of other questions and answers that were asked of you, answers that you gave at this statement before that same Assistant State's Attorney.

'Q. Okay, what happened after that?

A. They told me to keep my mouth quiet.'

Q. Who told you that?

MR. McNAMARA: I object, your Honor.

MR. HARRIS: Judge, he testified that nobody told him to be quiet about the incident until he spoke to *Joey Racanelli* two days afterwards by telephone. This is going to impeach that.

THE COURT: Objection overruled.

MR. HARRIS: All right.

'Q. Okay, what happened after that?

A. They told me to keep my mouth quiet.

Q. Who told you that?

A. *Joey Racanelli*.'

Do you remember those questions being asked of you by the Assistant State's Attorney and you giving those answers?

MR. McNAMARA: Your Honor, I object.

THE COURT: I will have to sustain the objection because I don't find it impeaching.

MR. HARRIS: Judge, he previously testified that nobody told him to—

MISS AMDUR: [assistant State's Attorney]: Judge, I would rather not argue in front of the jury.

MR. HARRIS: Okay, can we have a side bar?

THE COURT: All right."

C. Excerpts of the confession of defendant Johnnie Watters:

"Q. All right. On August 21st, 1981, were you in the apartment of Robert Reynolds at 4240 North Clarendon at about 5:30 in the morning?

A. Yes.

Q. What were you doing there?

A. I was robbing, taking some speakers and stuff.

Q. And were you alone?

A. No.

Q. Who were you with?

A. Me and Joey.

Q. Is that Joey Racanelli?

A. Yes.

Q. And was Reynolds in the apartment at the time?

A. Yes.

Q. Where was he?

A. In his bedroom.

Q. What was he doing?

A. He was sleeping.

Q. All right. How did you know that he was asleep before this?

A. I went in there.

Q. Was he alone?

A. No.

Q. Who was with him?

A. Was some other dude. I forgot his name.

Q. Was it Jimmy Lopez?

A. Yes.

* * *

Q. And when he woke up, what happened?

A. He looked around and looked at Joey's face.

Q. Did he look at you?

A. Yes.

Q. Where were you standing?

A. Right in the door.

Q. Did you have anything in your hands?

A. No.

Q. Did Joey have anything in his hands?

A. A knife.

Q. What kind of a knife?

A. Butcher knife.

\* \* \*

Q. And what did he do with the knife?

A. Stabbed him.

Q. How many times did he stab him?

A. One is all I seen.

Q. Where did he stab him, do you know?

A. Somewhere in the chest.

Q. And did Reynolds fall over then?

A. Let's see. He laid back. Then, he got back up.

Q. What happened after he got back up?

A. I don't know. I left.

Q. Did he get stabbed again?

A. I don't know.

Q. What did you do after Reynolds was stabbed?

A. Got the TV and went downstairs.

Q. Is that all you took?

A. What, a TV? Yes.

Q. Was the little boy, Jimmy Lopez, awake when the victim was stabbed?

A. He woke up after the victim was stabbed.

Q. And did he say anything?

A. Stop, stop.

Q. Who did he say that to?

A. Joey.

Q. And what happened after that?

A. The boy got dressed.

Q. When Jimmy said, stop, stop, did Joey stop?

A. Yes.

Q. He didn't stab him again after that?

A. Not that I know of.

Q. All right. What did you do after you left the apartment, after the stabbing?

A. I carried the TV downstairs.

Q. To where?

A. To the cab."

D. Excerpts of the confession of defendant Joseph Racanelli:

"Q. \*\*\*. Okay, Joseph, on the night of August 21, 1981, who were you with that evening?

A. Johnnie Watters.

Q. And what did you and Johnnie Watters decide to do at that time?

A. Rob the man's house.

Q. How did you decide that you were going to do this?

A. I went over and started drinking with him.

Q. Did you both go over to his house?

A. Not at first. I did.

Q. This was part of your plan, is that right?

A. Yes.

Q. You were going to drink with him?

A. Not at that time, I was not planning it because he had invited me to drink with him.

Q. But, you and Johnnie Watters then decided to rob Mr. Reynolds?

A. Yes.

Q. Now, how much did you and Mr. Reynolds drink?

A. About a quart of Baccardi.

Q. What happened after you drank that? What did Mr. Reynolds do?

A. After he got drunk, he went to sleep.

Q. What did you do then?

A. I was talking to somebody on the phone and I gave him a half hour to make sure he was asleep.

Q. What did you do then?

A. I called Johnnie Watters over.

Q. Where was he when you called him?

A. Over to Johnny Lopez' house.

Q. When Johnnie Watters came over, what did you and him do?

A. We started unplugging the TV and the stereo and stuff and set them by the door.

* * *

Q. Now, where was Johnnie while you were moving the stuff out of the apartment into the empty apartment?

A. He was in the bedroom.

Q. Okay, and what were you doing while Johnnie was in the bedroom?

A. Carrying the things out.

Q. And was anybody else in the bedroom at that time?

A. Yes, Jimmy Lopez. He was asleep.

Q. That is the same bedroom that the chest was in, right?

A. Yes.

Q. Now, what happened while you were moving the stuff out of the apartment of Mr. Reynolds into the empty apartment?

A. I heard Jimmy hollering.

Q. What did you do then?

A. I came back to see what was happening.

Q. What did you have in your hands when you went to see what was happening?

A. The knife.

Q. When you came back in the bedroom what did you see happening?

A. I seen Reynolds falling away from Johnnie.

Q. What did you do then?

A. We went and moved the rest of the things out.

Q. When you saw Mr. Reynolds fall from Johnnie did Johnnie have anything in his hand?

A. A knife.

Q. What was the matter with Mr. Reynolds?

A. Johnnie stabbed him.

Q. Was Mr. Reynolds bleeding?

A. Yes.

Q. Did you see Johnnie stab him?

A. No.

Q. What was Jimmy Lopez doing?

A. He was standing there hollering.

Q. What did you do after you saw all this?

A. I got panicky and I left.

Q. What did you say to Johnnie Watters?

A. I asked him why did he do it?

Q. What did you do about the stuff in the apartment?

A. We finished taking it.

Q. What did you say to Jimmy?

A. I told him not to say nothing.''

E. Excerpts of the opening argument by Assistant State's Attorney Linda Amdur:

"After the police talked to Jimmy Lopez, they then went on to locate Johnnie Watters and placed Johnnie Watters under arrest. *** What did Johnnie Watters tell the assistant State's Attorney when he was interviewed? *** Basically, *what Johnnie Watters told the assistant state's attorney was that he was in Robert Reynolds' apartment* on the 21st of August at about 5:30. He was there *with the defendant Racanelli*, and they were, in his words, robbing the

place, taking speakers and stuff, and he also said at that time Robert Reynolds was asleep and Lopez was asleep. *** *Watters says* that when he came back, that's when *he saw Racanelli stab the victim with the knife* *** he was soon to go on downstairs and get in a cab and *leave the scene with defendant Racanelli.*

I submit to you under this statement and by his own admission, defendant Watters is guilty of murder. He's committing a burglary and during the commission of that burglary, as he works with defendant Racanelli, the victim in this case Robert Reynolds was stabbed to death.

\* \* \*

Basically what Racanelli told the police was that Robert Reynolds had invited him over to his apartment. *He said that he and Watters then planned to,* what they call, *rob Reynolds* which, in law, would be to burglarize Reynolds' apartment.

Racanelli went on over to Reynolds' apartment and he started drinking with him, and he said they drank a lot that night. He waited until Reynolds fell asleep from drinking. ***

*He called Watters* and told him to come over, *and Watters came on over and they started to go through the apartment,* and they started to take exactly what they wanted.

\* \* \*

*[Racanelli] says, now Johnnie Watters grabbed one of those knives* *** *that he saw the defendant Watters stabbing the victim Robert Reynolds,* and he saw Reynolds fall back away from Johnnie Watters and Johnnie Watters was holding a knife.

\* \* \*

*What did Racanelli confess to in this statement?* He confesses to a lot of things. He tells you how Robert Reynolds let him into the apartment. He was given consent to enter the apartment, but *he tells how he planned with Watters what they would do."*

F. Excerpts of the closing argument by assistant public defender John McNamara, attorney for defendant Joseph Racanelli:

"There's something about this case that makes me very angry as an attorney, and that is the attitude of the prosecutors, that they can just throw this case right in front of you and say, let's let those two defense attorneys fight it out and decide who the jury is going to take down. It's the attitude of the prosecutors that say, we don't have any murder in this case. We don't have anything to prove in this case. In fact, we can't prove anything, so we'll just tell you, well, the two defense counsel, let them prove who is innocent and who is not.

\* \* \*

The State has brought in evidence of statements by both of these men, both of these young men. \*\*\* was Joseph Racanelli there when Watters made a statement? Was Joseph Racanelli able to see that statement and say, no, it's not true, yes, it is true? In fact, he has stated it is not true by pleading not guilty. \*\*\* and what does he [Jimmy Lopez] actually say about Joseph Racanelli? Does he say he saw him stab anyone? No. Does he say he was in the bedroom at the time of the stabbing? No. What do we know about Jimmy Lopez and his first story to the police? \*\*\* Then, he [Lopez] said, well, I didn't do it; it was Johnnie Watters.

\* \* \*

[A]nd *now they expect us to fight it out amongst each other.*"

G. Excerpts of the closing argument by Robin Harris, attorney for defendant Johnny Watters:

"\*\*\* so they went out and got who everybody's scapegoat in this case is, Johnnie Watters, and after they got a statement from him, then they charged him, but not from Jimmy Lopez' testimony, not on what he said.

*Remember that [Jimmy Lopez] is related to Joseph Racanelli.* Joseph Racanelli's mother is Jimmy Lopez' brother's wife. They are related. Has he got a motive? I believe the judge will instruct you that you can look at motives that people may have in this case. Has he got a motive to lie? He certainly does. He has more than one. Not only would he like to—as I asked him, would he like to protect Joseph Racanelli, but he certainly wants to protect himself. *For all we know, he and Joey Racanelli planned to rob Mr. Reynolds.* \*\*\*.

Then [Jimmy Lopez] came back and locked the bedroom door. Maybe he was protecting his brothers. *Maybe he was protecting Joey Racanelli.* We don't know. We know he doesn't care at all about Johnnie Watters. He's got no reason to try to protect him, but every reason in the world to put it on Johnnie Watters. He's not related to him.

MR. McNAMARA: *I have to object.*

THE COURT: All right.

\* \* \*

This honest witness, Jimmy Lopez, who didn't call the police, not because he wanted to protect Johnnie Watters, but *because he was protecting either himself or those he loved and was related to.*

\* \* \*

You've got a statement. This is a copy of the statement you are

going to get from Johnnie Watters. That's another link in their chain. *You are also going to have Mr. Racanelli's statement.*

\* \* \*

[W]hy would two people give statements saying that they were committing a burglary, but the other guy did the stabbing? You know why?

\* \* \*

*Jimmy Lopez could have made that knife wound.* It was—either one of them. They were only two and a half inches deep. His brothers could have made them. *Racanelli could have made it.*

\* \* \*

*You heard testimony about a phone call from Joseph Racanelli* the morning of the murder, of the killing, to the Lopez apartment. [W]e do have testimony that *Joseph Racanelli was alone in that apartment with Jimmy Lopez and the deceased* sometime later, and I submit to you, if you use your common sense, sometime later after Mr. Reynolds was killed, Johnnie 'the scapegoat' Watters is called over there because he's the guy, the dumbbell who can take the heat for this thing."